[No. 39212     En Banc.     April 17, 1969.]

SAM WEITZMAN, *Appellant,* v. E. V. BERGSTROM *et al.,*
*Respondents.*\*

*Preston, Thorgrimson, Horowitz, Starin & Ellis, Houger,*
*Garvey & Schubert, Kenneth L. Schubert, Jr.,* and *Michael*
*D. Garvey,* for appellant.

\*Reported in 453 P.2d 860.

*Phillip Offenbacker* (of *Short, Cressman & Cable*), for respondents.

ROSELLINI, J.—The respondent E. V. Bergstrom advertised in the newspaper that he had money to invest in a small business, and an agent of the appellant contacted him with an offer to sell him a vending machine "route" consisting of 1,000 machines which vended chewing gum balls, candy and trinkets, which were allegedly installed in supermarkets and other stores. These machines are familiar items and are known to be patronized by children.

The agent represented that the vending machines or dispensers had been installed for at least 5 months and that they yielded sufficient funds to afford a profit of approximately $2,000 per month. To illustrate the correctness of this, the agent took the respondent on his servicing tour of 650 dispensers and showed him that they yielded the amount which he had represented that they would yield.

The respondent and appellant entered into a conditional sales contract, whereunder for the sum of $45,000 the respondent bought the "route." He paid $15,000 down and agreed to pay a balance of $37,650,[1] $7,650 of this amount being charges for carrying the account. He made the payments required by the contract of $1,046 per month for 6 months, or a total of $6,275.

In the meantime, the respondent had discovered that the route was not producing more than half the amount which the appellant represented that it would produce. He complained about this and an agent of the appellant came from California to Seattle to help him "straighten it out." This man's efforts did not improve the situation appreciably, and the respondent fell behind on his payments.

The respondent had received the vending machine business during February 1962. On April 13, 1963, a new agreement was made, which reads as follows:

---

[1]For purposes of brevity and simplicity, we will use round figures in this opinion, since the merits of the appeal are not concerned with the exact figures.

E. V. Bergstrom, purchaser, and Operators Vending Machine Supply Company of Los Angeles, Calif. do hereby enter into the following compromise settlement and agreement:

1. Bergstrom agrees to fully execute a chattel mortgage on 1000 acorn vending machines which mortgage has previously been forwarded to Bergstrom. Company agrees that the first payment shall be on June 1st, 1963.

2. Payments on the said chattel mortgage shall be in the [sum of] $610.31 per month including principal and interest.

3. Bergstrom agrees to sign either 60 post dated checks or 60 notes.

4. Company agrees that on receipt of a properly executed chattel mortgage that the company shall issue a credit invoice in the amount of $1,000.00 dollars [sic] on Bergstrom's open account with company.

5. Company will ship free of charge to Bergstrom 3000 capsule bugs to replace a defective shipment of these bugs to Bergstrom.

6. Said chattel mortgage shall be fully executed and delivered to company on or before April 21st, 1963.

7. The said chattel mortgage shall supersede a conditional sales contract entered into prior to March 28th, 1962.

Dated this 13th day of April, 1963.

s/ E. V. Bergstrom
Operators Vending Machine
Supply Company
by s/ Herbert Goldstein
s/ E. V. Bergstrom

This agreement was made after the respondent had consulted an attorney, and after he had been told by the attorney and by an employee of the appellant that, if he tried to claim fraud against the appellant, the appellant would defeat the claim or, if he did not, that he would appeal and the long delay would cause the respondent to lose all that he had invested of time and money in the business.

It will be noted that the agreement does not refer to any claim of fraud.

The respondent made payments under this agreement for 5 months, and made additional payments of $800, and then made no further payments. The appellant commenced this action in March 1965 to foreclose the mortgage.

The respondent raised the defense of fraud, and his evidence showed that the appellant's agent had misrepresented the earning capacity of the dispensers and their worth and had misrepresented the length of time they had been installed. It showed further that the agent had resorted to trickery in taking the respondent with him to view the collections from the machines, in that collections had not been made 1 month previously as represented. In other words, the machines contained earnings for a much greater period of time than that. Furthermore, none of the machines had been installed as long as 5 months.

At the trial, it developed that, if the machines were bought as merchandise, the price would be $16 per machine plus $2 for a stand, giving them a total value of $18,000. The remainder of the purchase price of $45,000 was, according to the appellant's testimony, attributable to "good will." The good will in turn was attributable to the fact than an agent of the appellant had spent part of his time during 3 or 4 months finding locations for the machines and setting them up in the locations.

The trial court found that the contract of sale was induced by fraud; that the true value of the "route" was no more than $25,000, if that much, and that the charges in addition to the purchase price which were included in the note and mortgage were intended to be and were in fact interest. It further found, basing its judgment on the uncontradicted testimony of an accountant, that the interest was usurious. Deducting the penalties for usury and the damages for fraud from the balance owing on the note and mortgage, the court found that the debt had been paid in full. In its judgment, it directed the appellant to satisfy the mortgage of record.

The appellant urges that the court erred in permitting the respondent to maintain his defense of fraud, contend-

ing that this defense was waived when the respondent signed the "compromise settlement and agreement."

The rule in this jurisdiction is that one who seeks to rescind for fraud must act promptly after its discovery, but this is not the rule where the defrauded party elects to affirm the contract and sue for damages, unless his silence has in some way operated to the injury of the other party. *Grosgebauer v. Schneider*, 177 Wash. 43, 31 P.2d 90 (1934).

Affirmance of a contract is not a waiver of the fraud and does not bar the right to recover damages, but merely bars a subsequent rescission. *Buttnick v. Clothier*, 43 Wn.2d 667, 263 P.2d 266 (1953).

This case falls within these rules unless, as the appellant urges, the respondent's failure to assert the fraud before this action was commenced has operated to the injury of the appellant. It is the appellant's contention that, by agreeing to an extension of the time for making payments and a reduction of the monthly payments (as well as an increase in the total interest), the appellant has suffered injury. Or, as the appellant puts it, by accepting the extension of time and the benefits of a reduced monthly payment plan, the respondent waived any claim for damages for fraud.

It must be conceded that the general rule is as stated by the appellant. When a party claiming to have been defrauded, after discovery of the fraud receives from the party guilty of fraud some substantial concession or enters into new arrangements or engagements concerning the subject matter of the contract claimed to have been procured by fraud, he is deemed to have waived any claim for rescission, and under certain circumstances for damages. The latest case in which this rule was applied in this jurisdiction is *Owen v. Matz*, 68 Wn.2d 374, 375, 413 P.2d 368 (1966). In that case the trial court found as a fact that there was no fraud and further found that the parties entered into a supplemental agreement respecting payment and "long after the defendants had taken pos-

session of and when they were well aware of the condition of the premises and of its suitability for use and occupancy."

There were in that case two factors which are absent here. First, there was no fraud as a matter of fact and, second, the affirmance of the contract was *inconsistent* with a contention that the premises were unsuitable for occupancy.

In this case the fraud is so patent that the appellant does not seriously contend that the trial court erred in finding its existence. The respondent's acceptance of an agreement whereby his monthly payments would be reduced was wholly consistent with the existence of the fraud. It was because the dispensers were not producing more than one half of the profits guaranteed by the appellant that the respondent was unable to make the payments required by the contract. The appellant knew this, and he does not deny it. He knew also that the respondent was afraid to assert the fraud for fear he would lose not only the opportunity to have the payments reduced but also all the money and time he had already invested in the little business. One of the appellant's agents had assured him of this.

It is true that the respondent was represented by an attorney at the time of the extension agreement, but it is not at all clear that the attorney was made aware of the nature and extent of the fraud at that time. The respondent was still hoping that matters would improve and the promised flood of copper, nickel and silver would pour forth from the gum ball dispensers. It is true that a reasonable man would not have retained such hopes, but the very fact that the respondent entered into this agreement in the first place shows that he does not qualify as the reasonably prudent man. And there can be no doubt that the appellant was aware of this fact and took full advantage of it. Nothing which the appellant did was done in reliance on any representation of the respondent.

The evidence showed that the appellant was not interested in repossessing the dispensers and risking the termination of the contract. This is not surprising, since he

recognized their true worth and evidently surmised that it was more to his advantage to keep the respondent indebted to him. Any future payments, now that he had received the actual worth of the machines, would be pure profit, and if the respondent was unable to make those payments, the appellant could sue him on the debt (evidenced by the note and mortgage) and realize whatever profit he could out of the respondent's property. Since the "new agreement" had been entered into, the appellant supposedly had the further advantage of the right to assert that any claim of fraud had been waived.

■ It should be remembered that waiver is an equitable doctrine. Its purpose is to facilitate the doing of equity, not the perpetration of fraud. While reliance is not a requirement, as it is in the doctrine of estoppel (*see Kessinger v. Anderson,* 31 Wn.2d 157, 196 P.2d 289 (1948)), it is still necessary to show that the party who it is claimed has waived a right, did so intentionally and with full knowledge of his rights. In *Vinneau v. Goede,* 50 Wn.2d 39, 309 P.2d 376 (1957), we held that the question whether there was an intent to waive is one of fact.

■ This is, of course, not an ordinary case. The general rule that the entering into a new agreement regarding the subject matter evidences an intention to waive a claim of fraud is sound. It can generally be assumed that a party having a claim of fraud will assert it in any negotiation with the defrauding party and will demand some concession, and that if there is merit to the assertion, a concession will be made.

The cases cited by the appellant, in which this rule has been applied, are *Owen v. Matz, supra; In re Estate of Phillips,* 46 Wn.2d 1, 278 P.2d 627 (1955); *Kessinger v. Anderson, supra; Bonded Adjustment Co. v. Anderson,* 186 Wash. 226, 57 P.2d 1046, 106 A.L.R. 166 (1936); *Keylon v. Inch,* 178 Wash. 522, 35 P.2d 73 (1934); and *Crocker v. Boyd,* 88 Wash. 685, 153 Pac. 1076 (1915).

As we have already observed, the court in *Owen v. Matz, supra,* found as a fact that there was no fraud. In *In re*

*Estate of Phillips, supra,* the alleged fraud was actually compromised. In *Kessinger v. Anderson, supra,* the question of whether there had been a fraudulent misrepresentation was vigorously disputed and there was substantial evidence that the purchaser had not been deceived. In *Bonded Adjustment Co. v. Anderson, supra,* the evidence of fraud was similarly weak; and in *Keylon v. Inch, supra,* the court found as a fact that the defendant had not participated in the fraudulent representations which had been made by others. Finally, in *Crocker v. Boyd, supra,* the settlement in question was made with specific reference to alleged misrepresentations. Thereafter the purchaser of the land involved brought an action for additional misrepresentations. In applying the rule that a settlement precludes a subsequent claim of fraud, the court observed that the plaintiff's pleadings were pervaded with a want of candor which made the reader inclined to distrust the plaintiff rather than the defendants.

Thus it appears that in the cases where this rule has been applied, it has operated to promote justice rather than to thwart it. If this were not the operation of the rule, the courts would be in error in adopting it. In the case before us, a blind adherence to the rule would produce, not a salutary effect, but a gross miscarriage of justice. To assume in this case that, because the respondent did not assert his claim of fraud when the extension of time was offered, he did not have one, would be to ignore the uncontroverted facts. The respondent said that he did not assert his claim because he was intimidated. The trial court found this to have been the fact and it is the only plausible explanation of his conduct. Whether this intimidation was due entirely to the advice given him by the appellant's agent, or by advice given him by his own attorney (apparently without full knowledge of the facts), or by his own misapprehension of his own and the appellant's rights, we think is not determinative. In fact, he has a valid and substantial claim and he did not assert it and it would be unconscionable for the court to deny him the right to assert it now.

It cannot be successfully urged that to allow the respondent to assert his claim results in an injustice to the appellant because the appellant relied on a waiver of the claim when it agreed to extend the time for payment and reduce the monthly payments (and increase the interest). It may be that the appellant did rely on the assumption that the claim was waived, and it can be assumed that the appellant would not have granted the extension if the respondent had asserted his claim and insisted that the price be reduced. Nevertheless, no substantial right of the appellant was lost thereby. He had already been paid more than the dispensers were worth, according to the evidence, and more than he was entitled to recover in an action on the contract, as the results of this action disclose. It is true that the appellant has lost the benefit of his bargain, but his bargain was not one which the law will enforce.

The trial court found as a fact that there was no intent to waive, and there was substantial evidence to support that finding. If there is no intent, there is no waiver. *Vinneau v. Goede, supra.* It is also questionable whether the respondent can be said to have had full knowledge of the facts at the time of the agreement, since he evidently did not know how little the dispensers were actually worth. But we need not base our decision on this ground, since there was ample evidence that there was no intent to waive.

We hold that the trial court did not err in permitting the respondent to recover on his claim of damages for fraud. The evidence supports the court's findings that the dispensers sold to the respondent, together with the value of the appellant's services in installing them in supermarkets and other stores, did not exceed $25,000, since the appellant's evidence showed that the value of the dispensers and the stands on which they were installed was in the approximate amount of $18,000, and no more than 4 months of services of two employees were involved in finding locations for and installing them.

We come now to the question whether the trial court erred in finding that the interest charged on the note and mortgage was usurious.

The first contract of the parties was termed a conditional sale.[2] The so-called "compromise settlement and agreement" specifically provided that the "said chattel mortgage shall supercede [sic] a conditional sales contract entered into prior to March 28, 1962." Nevertheless, the appellant argues that the court should look behind the designations used by the parties to the true nature of the transaction. Assuming that, as the appellant contends, the court should do this in order to protect a party from a charge of usury, we find upon taking such a look that there is a note and mortgage. These are evidences of a debt, and it is reasonable to assume that the appellant exacted these instruments in order to make himself more secure in seeking his deficiency judgment in event of further default on the part of the respondent. It is not improbable that he also had in mind a possible negotiation of the note to a bona fide purchaser for value, thereby cutting off certain defenses. In any event, the appellant evidently wished to change the transaction from a sale into a loan. Having employed these devices to do so, he cannot now be heard to say that it was all a subterfuge, in order to escape the penalties imposed by law upon the usurer.

In 55 Am. Jur. *Usury* § 23 (1946), at 341, we find the following statement:

Although there is some authority indicating a contrary view, the extension of the time for the payment

[2]The contract, drawn by and strongly favoring the rights of the appellant, provided for repossession in case of default, and also provided for the recovery of a deficiency judgment. This gives rise to a question whether the intent was to pass title to the property and loan the money for the balance of the purchase price to the respondent, thus creating a debtor-creditor relationship rather than a seller-purchaser relationship. *See Hafer v. Spaeth,* 22 Wn.2d 378, 156 P.2d 408 (1945), a decision of this court which was in accord with the prevailing climate of judicial opinion but the validity of which is now open to question in light of subsequent experience. *See* comments of Professor William N. Warren, *Regulation of Finance Charges in Retail Instalment Sales,* 68 Yale L. J. 839, 843 (1959).

of a balance due under a conditional sales contract, or a so-called "refinancing" thereof whereby a new conditional sales contract is executed by the purchaser under the original contract, is ordinarily viewed as a loan or a forbearance of a debt, rather than a bona fide conditional sale, and a finance or similar charge contracted for in connection therewith constitutes usury if in excess of the maximum lawful interest.

6 S. Williston, Contracts § 1686 (1938) states:

Forbearance of an existing debt may be as obnoxious to usury statutes as an original loan if a charge greater than legal interest is made for the forbearance. Nor is the transaction saved from illegality if the agreement provides that the creditor, as part of his forbearance, shall dismiss an action or forbear to exercise some other legal remedy for the collection of his claim. It should be observed, however, that it is the contract for forbearance which is usurious and that the original indebtedness is not thereby rendered illegal.

An annotation on finance charges in connection with conditional sales contracts as usury in 143 A.L.R. 238 (1943) states, at 265:

The cases upon this phase of the subject indicate that the extension of the time for payment of a balance due under a conditional sale contract, or a so-called "refinancing" thereof whereby a new conditional sale contract is executed by the purchaser under the original contract, is ordinarily viewed as a loan or a forbearance of a debt, rather than a bona fide conditional sale, and that a finance or similar charge contracted for in connection with such extension or refinancing arrangement constitutes usury if in excess of maximum lawful interest. However, there is some authority that at least indicates a contrary view (Wernick v. National Bond & Invest. Co. (1934) 276 Ill App 84, stated infra).

We find the following cases to be supportive of the above textual statements. *Bonetti v. United Beauty Supply,* 31 N.Y.S.2d 463 (Sup. Ct. 1941); *London v. Toney,* 263 N.Y. 439, 189 N.E. 485, 91 A.L.R. 1100 (1934); *San Joaquin Fin. Corp. v. Allen,* 102 Cal. App. 400, 283 P. 117 (1929); *Petersen v. Philco Fin. Corp.,* 91 Ida. 644, 428 P.2d 961 (1967); *Liebelt v. Carney,* 213 Cal. 250, 2 P.2d 144, 78 A.L.R. 405

(1931); *Bell v. Idaho Fin. Co.*, 73 Ida, 560, 255 P.2d 715 (1953); *Associates Discount Corp. v. Ruddock,* 224 Miss. 533, 81 So. 2d 249 (1955). *Contra, Wernick v. National Bond & Investment Co.,* 276 Ill. App. 84 (1934).

The trial court found upon the evidence that the note and mortgage provided for interest and that the interest provided for therein exceeded 12 per cent per annum. The appellant maintains that some of the charges were not in the nature of interest but the trial court found to the contrary and its finding is supported by the evidence.

Under RCW 19.52.020, the transaction was usurious, and the trial court correctly imposed the penalties prescribed in RCW 19.52.030.

The judgment is affirmed.

HUNTER, C. J., WEAVER, HALE, and McGOVERN, JJ., concur.

NEILL, J. (dissenting)—There is no need to reiterate the facts which are set forth in the majority opinion. As a result of the complaints of the defendant and defaults in payment, an agent of the plaintiff returned to Seattle in February of 1963 and spent 4 weeks trying to improve defendant's situation. The difficulties continued.

Defendant, being pressed for payments, sought the advice of counsel and retained an attorney to represent him in further negotiations with plaintiff. On April 13, 1963, plaintiff's agent and defendant entered into a compromise agreement.[3] This compromise agreement was prepared by defendant's attorney and executed in his office. It provided for execution of a chattel mortgage by the defendant which was to supersede the original contract. On May 1, 1963, defendant executed the chattel mortgage and note. The cash price under the new agreement was $27,124.90, plus charges of $9,493.70, payable in 60 monthly installments of $610.31, beginning June 15, 1963. The June, July, August, September and October, 1963 payments were made. In the following year only $800 was paid—$500 in January and $300 in July.

---

[3] The agreement is set forth in full in the majority opinion.

In November, 1965, plaintiff commenced this action on the promissory note and to foreclose the chattel mortgage. The defendant raised the affirmative defenses of fraud and usury. The court found that defendant was induced to enter the original sale contract by the fraudulent misrepresentations of the plaintiff's agents.

The court found $20,000 damages for fraud, and offset an additional $12,409.85 in usurious interest charges. As a result, the chattel mortgage was declared paid in full and defendant was awarded costs. Plaintiff raises two questions by his assignments of error: (1) Did the compromise agreement preclude the defense of fraud? (2) Were the note and chattel mortgage usurious?

Although plaintiff has not challenged the findings of fraud in the inducement of the sale contract, he contends that the defendant, by the compromise agreement, waived any claim of damages for such fraud.

From an early date, we have held that a compromise of a dispute wherein fraud is claimed prevents a later assertion of the same fraud. In *Crocker v. Boyd*, 88 Wash. 685, 153 P. 1076 (1915), the plaintiff purchased some land. After possession was transferred, the plaintiff discovered that certain misrepresentations had been made. Through her attorney, plaintiff secured a settlement with the sellers. Eight months after the settlement, the plaintiff brought suit based on the same fraud. The court stated at 686:

> The settlement did not, to be sure, recite that it was in full, but the defendants alleged that they believed it was. She was then in possession, with ample opportunity to see what was wrong in the property, yet she reserved no right to bring up new grievances, and it must be presumed that defendants would not have settled with her then if she had reserved that right.
>
> Whether in deceit cases it is possible to split grievances in partial settlements and retain the fraud basis at all for subsequent litigation we need not decide, for we are satisfied that, when plaintiff's allegations are read with the contract for exchange and the contract of settlement appended to the answer, the settlement must be enforced as final.

In *Keylon v. Inch,* 178 Wash. 522, 35 P.2d 73 (1934), the plaintiff purchased a garage and subsequently discovered there had been some misrepresentations made by the seller. Plaintiff sought to secure a cancellation of a note and a mortgage which he had executed as part of the transaction. The parties finally agreed to a settlement, but 3 days later the plaintiff brought suit for damages based on fraud. In affirming the dismissal of plaintiff's suit by the trial court, we adopted, at 531, the following statement from *Burne v. Lee,* 156 Cal. 221, 104 P. 438 (1909):

". . . when a party claiming to have been defrauded, enters, after discovery of the fraud, into new arrangements or engagements concerning the subject-matter of the contract to which the fraud applies, he is deemed to have waived any claim for damages on account of the fraud."

In *Bonded Adjustment Co. v. Anderson,* 186 Wash. 226, 231, 57 P.2d 1046, 106 A.L.R. 166 (1936), we said:

It is fairly inferable from the allegations of the amended answer and cross-complaint that the appellants had knowledge of the alleged fraud in August, 1930; but, in any event, it is admitted that they had full knowledge in June and August of 1931. Notwithstanding this, they made a new arrangement for credit in September, 1930, under which they secured an extension of time for payment of part of the first installment of the purchase price. Again, on March 12, 1932, after their default on the final installment, as well as on the note given for part of the first installment, they made another arrangement for further time and the giving of two new notes to cover the whole of the debt due upon the tractor.

The facts bring the case clearly within the principle announced in *Keylon v. Inch,* 178 Wash. 522, 35 P. (2d) 73, that, when a party claiming to have been defrauded enters, after discovery of the fraud, into new arrangements or engagements concerning the subject matter of the contract to which the fraud applies, he is deemed to have waived any claim for damages on account of the fraud.

*Accord, Owen v. Matz,* 68 Wn.2d 374, 413 P.2d 368 (1966). *See also Kessinger v. Anderson,* 31 Wn.2d 157, 196 P.2d

289 (1948). The general rule is found in 24 Am. Jur. *Fraud and Deceit* § 214 (1939) at 42:

[I]f one induced by misrepresentations or fraud to deal or acquire, or to enter into a contract for the acquisition or use of, property thereafter, with knowledge of the deception, receives from the party guilty of fraud some substantial concession or enters into a new contract in respect of the transaction, he thereby relinquishes all right to recover or recoup damages because of the misrepresentations.

A party claiming fraud waives his right to damages for that fraud when he enters into a compromise of the dispute, unless he clearly and objectively manifests his intent not to waive his claim for damages due to the fraud. There is no evidence in this record to justify finding that the defendant intended to reserve his claim for damages due to the fraud. We are not here dealing with a "babe in the woods." Defendant had engaged in several businesses, had had experience in buying and selling businesses, and was represented by counsel who drafted the compromise agreement.

The trial court seemed to rely on the doctrine of business compulsion to negate the effect of the compromise agreement. Business compulsion is a modern species of duress which will, like common law duress, vitiate a contract induced thereby. *See Marrazzo v. Orino,* 194 Wash. 364, 78 P.2d 181 (1938); 25 Am. Jur. 2d *Duress and Undue Influence* § 7 (1966). However, a threat of litigation made in a good faith belief that a cause of action exists will not constitute duress even though no cause of action exists. *Doernbecher v. Mutual Life Ins. Co.,* 16 Wn.2d 64, 132 P.2d 751 (1943). In order for such a threat to constitute duress it must threaten an abuse of process. Also the mere fact that one enters into a compromise agreement or contract as a result of the pressure of business circumstances or pecuniary necessity does not constitute duress or business compulsion. In order to constitute duress, some unlawful or unconscionable pressure must be applied. *See Starks v. Field,* 198 Wash. 593, 89 P.2d 513 (1939); *Kohen*

*v. H. S. Crocker Co.*, 260 F.2d 790 (5th Cir. 1958). Any pressures placed upon defendant do not fall within those categories.

Moreover, it is a fundamental rule that a person who seeks to disaffirm a contract made under business compulsion must act promptly upon removal of the duress. *Walla Walla Fire Ins. Co. v. Spencer*, 52 Wash. 369, 100 P. 741 (1909). In the instant case, the defendant made five installment payments of principal and interest upon the second agreement and three partial payments. The facts of this case fail to establish business compulsion.

The first contract entered into by the plaintiff and defendant was a conditional sale. Such a transaction is not subject to the usury statute. *Hafer v. Spaeth,* 22 Wn.2d 378, 156 P.2d 408 (1945).

The compromise and settlement agreement specifically provided that the "said chattel mortgage shall supercede [*sic*] a conditional sales contract entered into prior to March 28th, 1962." The use of the word supersede indicates that the parties were entering into a new and different transaction. The compromise agreement was made after complaints of fraud by the defendant and threats of litigation by the plaintiff were made. It was agreed that the balance outstanding on the sale would be compromised down to $27,124.90. The carrying charges to be added were in the amount of $9,493.70, or a total sum of $36,618.60. The payments per month were reduced to $610.31, and the time extended to 60 months, beginning June 15, 1963.

The compromise agreement was not merely an extension of the orginal sale transaction as plaintiff urges in his attempt to extricate it from the scope of the usury statute. It was a forbearance of an outstanding debt. The sale had already taken place and the defendant was in possession of the merchandise. If the defendant had paid the sum of $27,124.90 at the time the compromise agreement was reached, the indebtedness would have been discharged. Instead, it was forborne, the payments were reduced and extended, and the sum of $9,493.70 was

charged to the defendant for this forbearance. *Hafer v. Spaeth, supra; Deitch v. Kessler,* 13 Misc. 2d 421, 177 N.Y.S.2d 792 (1958). In *Knight v. American Inv. & Imp. Co.,* 73 Wash. 380, 132 P. 219 (1913), we held a contract to pay $5,000 for an extension of the time for payment of some mortgage notes usurious.

This case presents the converse of those cases holding that a usurious instrument remains usurious unless it is replaced by a new, different, and clean instrument. *Celian v. Coast Fin. Corp.,* 189 Wash. 676, 66. P.2d 363 (1937.); *Clausing v. Virginia Lee Homes, Inc.,* 62 Wn.2d 771, 384 P.2d 644 (1963). The parties began with a clean (insofar as usury is concerned) conditional sale contract. Searching for the real transaction between the parties and disregarding evasions and subterfuges of all kinds, I find a compromise agreement that is new and different, but unclean. The sum of $9,493.70 was found by the trial court to be interest and in excess of 12 per cent, and usurious. This finding is correct. RCW 19.52.020.

Even though the original conditional sale contract was not usurious at its inception, the compromise agreement is subject to the application of the usury statute. 55 Am. Jur. *Usury* § 23 (1946); 6 Williston, Contracts § 1686 (1938); Annot., 143 A.L.R. 238, 265 (1943).

A usurer is entitled to recover only the principal less the penalty for usury. RCW 19.52.030. Installment payments are applied first to interest and the remainder, if any, to principal. *Western Loan & Bldg. Co. v. Larsen,* 110 Wash. 213, 188 P. 390 (1920); *Clausing v. Virginia Lee Homes, Inc., supra.*

The defendant is entitled to the following credits on his original obligation of $27,124.90:

(1) The sum of $3,916.46, being double the interest actually paid;

(2) The sum of $7,535.47, being the interest accrued but unpaid;

(3) The sum of $1,892.94, being payments allocated to principal.

I would remand with directions to enter judgment for plaintiff in the sum of $13,780.03.

HILL, FINLEY, and HAMILTON, JJ., concur with NEILL, J.