[No. 46934–2.   En Banc.   December 31, 1980.]

# E. A. NORRIS, *Petitioner*, v. HENRY C. NORRIS, ET AL, *Respondents*.

*Gebhardt, Looney & Sherrick,* by *Frank J. Gebhardt,* for petitioner.

*Paine, Lowe, Coffin, Herman & O'Kelly,* by *Gary A. Dahlke* and *James M. Kalamon,* for respondents.

HOROWITZ, J.—This case concerns a father's action to quiet title in a ranch against competing claims of his son and grandson. The plaintiff's claim is based on a community property agreement with his deceased spouse; the son's and grandson's claims on reciprocal wills executed by the plaintiff and his spouse prior to the making of the community property agreement. The trial court quieted title in the father, but the Court of Appeals reversed. For the reasons stated below, we affirm the Court of Appeals.

I

Plaintiff E. A. Norris and his wife, Irene, owned as community property a large ranch in Adams County. E. A. and Irene Norris had no natural children, and in 1950 they adopted Henry Norris, who they had raised from childhood. Henry Norris and his wife worked the ranch owned by his parents from 1951 until the present. At first, Henry worked on the ranch for pay. In 1954, he and his father entered into a partnership for operation of the ranch. Since 1968, E. A. and Irene had lived in Ritzville. Because of a hip condition, E. A. is unable to do heavy work, and he has not worked on the ranch for many years.

In spring 1970, E. A. and Irene Norris visited their family attorney to discuss estate planning. The Norrises expressed their desire to eventually leave the ranch to their son

Henry. On the advice of their attorney, who drafted the documents, the Norrises executed reciprocal wills leaving the surviving spouse a life estate in the ranch, with a remainder in most of the ranch to Henry and a remainder in the rest of the ranch to Henry's son Ernie.

Shortly after executing their wills, the Norrises visited with their friends, the Armstrongs. The four friends discussed the Norrises' new wills and the Norrises mentioned their desire to leave the ranch to Henry. The Armstrongs told the Norrises about community property agreements, stating that it was not necessary to go through probate if a community property agreement was executed and that no inheritance taxes would be assessed at the death of the spouse. The Norrises expressed their interest in such an agreement and the Armstrongs, neither of whom was trained in the law, obtained and filled in the blanks on a form community property agreement for the Norrises. Without consulting an attorney, the Norrises executed the agreement before a notary public and it was recorded on June 10, 1970, some 2 months after execution of the reciprocal wills. The wills were not explicitly revoked in the community property agreement. E. A.'s sister, however, testified at trial that Irene told her that she was satisfied with the agreement's disposition of their community property.

On August 7, 1970, Irene died. In late September 1970, E. A. and Henry visited the family lawyer. E. A. informed the attorney that probate was unnecessary because of the community property agreement. The lawyer testified that he told E. A. of the adverse tax consequences of using the community property agreement and that E. A. then indicated to him that he would "go with the will;" that E. A. preferred to have the will probated and disregard the community property agreement.[1] The family lawyer testified that he believed the community property agreement was

---

[1]See finding of fact No. 10: "[I]t was decided to go ahead with the probate of the March, 1970, will."

void ab initio because it was based on the spouses' mutual misunderstanding of its consequences. E. A., on the other hand, testified that he assumed the lawyer knew he wanted to own the property outright and that he therefore continued to assume that the actions taken thenceforth were consistent with that desire. The trial court found that E. A. did not understand the consequences of probate and that he thought he owned all interest in the property. Finding of fact No. 15.

On the basis of his understanding that Irene's will was to be probated, the family lawyer drew up the appropriate papers. E. A. was appointed as personal representative of Irene's estate, and in that capacity he signed a number of documents, including an inventory, notice to creditors, final account and petition for distribution in conformity with the will. E. A. testified that he did not read the papers before signing them, although he also signed verifications that he had read and understood the documents. The family attorney testified that E. A. read all documents carefully. Because of his hip condition, which prevents him from climbing stairs, E. A. was not actually present at any of the court proceedings involved in the probate of Irene's estate.

In 1972, Irene's estate was distributed pursuant to the petition for distribution. The estate was closed in January 1974. No appeal was taken from the probate decree. Henry Norris knew that under his mother's will he had a remainder interest in the ranch. Mr. and Mrs. Armstrong, the couple who had helped the Norrises prepare their community property agreement, discussed the probate with E. A. Both testified that E. A. told them that the agreement could not be used because of adverse tax consequences due to the size of the Norrises' holdings.

After Irene's death, Henry continued to work the ranch and made certain improvements. His father transferred as gifts to him much of the equipment on the ranch. Henry asked his son and his son's wife to leave their jobs in Spokane and move onto the ranch, which they did in 1974.

Both Henry and Ernie testified that they took their actions because of the remainder interests in the ranch.

In 1971, E. A. had met Kathleen Hallstrom, a former real estate agent 30 years his junior. In 1975 they were married. Shortly thereafter, the family was discussing ownership and rental of the ranch. E. A. asked for an increase in rental payments and Kathleen informed Henry that the community property agreement of 1970 gave E. A. complete ownership of the ranch. E. A. concurred in her statements.

The original community property agreement, which was retained by E. A. after his discussions with the family lawyer, had not been found. The document was proved at trial by conformed recorded copy.

In 1977, E. A. began this action to quiet title to the ranch. After a trial before a judge, the Superior Court for Adams County entered judgment for plaintiff quieting title to the ranch in E. A. as his separate property. The Court of Appeals, Division Three, reversed the trial court, holding that the plaintiff's acceptance of benefits by probating the will constituted a disclaimer of the community property agreement.

This case raises questions regarding the validity of the probate of Irene's will and whether that proceeding now prevents her spouse from claiming under their community property agreement. The determination of whether E. A. can now claim under the community property agreement focuses on two general issues. First, we examine whether the earlier probate proceeding could have any effect at all in light of the existence of a community property agreement signed by the decedent. Second, if the probate proceeding was jurisdictionally justified, we must determine whether it had the effect of "cutting off" any rights under the community property agreement either because its effects cannot be challenged as res judicata or because his actions constituted an election of the will's provisions by E. A.

## II
### PROBATE JURISDICTION

The plaintiff argues that the probate proceedings based on Irene's will can have no effect because there was no property subject to the probate jurisdiction of the Superior Court. Because the community property agreement vests all community property in the surviving spouse at death, the plaintiff contends that there was no property for the probate proceedings to act upon. *In re Estate of Wittman,* 58 Wn.2d 841, 365 P.2d 17 (1961). Thus, E. A. argues, the purported distribution to his son and grandson of the remainder interest would be void.

We find this argument unpersuasive because the existence of a community property agreement does not necessarily prevent probate of the estate of the spouse dying first.

Contrary to the trial court's reasoning in its memorandum opinion, the community property agreement does not prevent administration of the estate of a decedent who owned only community property subject to the agreement. The cases cited by plaintiff to support this contention involved *procedural* jurisdictional defects. In addition, the decedents in those cases had no claim to title in the property purportedly passed in their estates. *See Mezere v. Flory,* 26 Wn.2d 274, 173 P.2d 776 (1946) (decedent had no interest in realty that could have been passed to devisees; earlier probate through which decedent purported to take title was procedurally faulty because minor children were not represented by guardian and no proof of publication of notice of hearing was on file); *Parr v. Davison,* 146 Wash. 354, 262 P. 959 (1928) (decedent with only life estate had purported to pass fee simple in realty to devisees; true owner entered no appearance and had no personal notice of probate proceedings).

The fact that community property passes to the surviving spouse at death does not prevent administration of the community property in the deceased spouse's estate. The property remains community in nature until the spouse's

death, and the possibility of administration is explicitly acknowledged in RCW 11.02.070:

> The whole of the community property shall be subject to probate administration for all purposes of this title . . .

The courts of this state have, in the past, examined the effect of community property agreements in the course of probate proceedings. *See, e.g., In re Estate of Wittman, supra; In re Estate of Lyman,* 7 Wn. App. 945, 503 P.2d 1127 (1972). The right to probate the deceased spouse's estate is also implied in the court's power pursuant to RCW 26.16.120 to "set aside or cancel such [community property] agreement for fraud or under some other recognized head of equity jurisdiction".

There is no general impediment to the probate of a decedent's estate that consists solely of community property subject to a community property agreement. The community property agreement imposes no limitation on the disposition of the property by the surviving spouse after the death. Having so determined, we must now consider whether the probate proceedings undertaken by E. A. constituted an election of the will and thus now prevent plaintiff from quieting title under the community property agreement.

## III
### ELECTION OF WILL

The probate decree has res judicata effect over the instant quiet title action, the probate of Irene's will constituting an election by E. A. of the provisions of the will over the community property agreement.

### A
### RES JUDICATA EFFECT OF PROBATE

Res judicata acts to prevent relitigation of claims that were or should have been decided among the parties in an earlier proceeding. In this case, because the applicability of the community property agreement could and should have been determined in the probate of Irene's estate, res

judicata prevents the court from now reexamining the distribution in light of the community property agreement:

> A decree of distribution stands upon the same footing as any other judgment rendered by a court of general jurisdiction; it constitutes in itself a construction of the will of the decedent; and even though it be erroneous in law, yet if it be rendered upon due process of law and no appeal therefrom is taken, it becomes a final and conclusive adjudication determining what property belongs to the decedent's estate, the nature thereof, and the person or persons who have acquired the title to it.

*Tacoma Sav. & Loan Ass'n v. Nadham,* 14 Wn.2d 576, 594, 128 P.2d 982 (1942).

Illustrative of the application of res judicata to probate proceedings is the case of *In re Estate of Ostlund,* 57 Wash. 359, 106 P. 1116 (1910). In *Ostlund,* the court refused to allow a collateral attack by the pretermitted children of the decedent of the decree of distribution that had passed all the decedent's property to her husband. Although the children were by statute clearly entitled to a portion of their dead mother's estate, the court refused to consider the merits of their claims:

> The contention that the court, in rendering the decree, erroneously determined who was entitled to the property . . . goes only to the merits of the question then before the court, and is wholly foreign to the question of the jurisdiction of the court to determine who was entitled to the property then being distributed.
>
> . . .
> . . . It is true the decree does not create the title in the distributees, but it is a solemn adjudication of who acquired the title of the deceased, and if rendered upon due process of law is final and conclusive upon that question. Its very object and purpose is to judicially determine who takes the property left by the deceased.

*In re Estate of Ostlund, supra* at 364.

The holding of *Ostlund* binds us here. In *Ostlund,* the decedent's children were claiming an intestate share of property distributed by will. They had not raised the claim during probate and did not appeal from the probate decree.

Here, E. A. claims his intestate community property right to Irene's property, which was instead distributed by will. He did not raise this claim during probate and did not appeal. Because the court had jurisdiction over the property, res judicata prevents his attempt to now overthrow the decree of distribution.

## B
### DECISION NOT TO TAKE THE BENEFITS OF COMMUNITY PROPERTY AGREEMENT

The conclusion that the probate decree should be given res judicata effect is bolstered by an examination of E. A.'s actions in the probate proceedings. Plaintiff argues that such "disclaimer" was impossible before the enactment in 1973 of RCW 11.86.020, which expressly provides for disclaimer of "any interest in whole or in part" by a beneficiary of the decedent's estate. E. A. contends the concept of disclaimer is inconsistent with the *contractual* distribution of property created by community property agreements. He cites the case of *In re Estate of Wittman, supra* at 843–44:

> The community property agreement statute, RCW 26.16.120, enables husbands and wives to enter into community property agreements concerning the status and disposition of their property to take effect upon the death of either. *In re Brown's Estate,* 29 Wn.(2d) 20, 185 P.(2d) 125 [(1947)], held that such enforcible contracts are not wills and are not governed by the laws relating to wills. They are completely executed when one of the parties to the recorded contract dies. . . . Unless such a recorded contract is rescinded by the parties, it constitutes a conveyance by a decedent to a surviving spouse.

*See also In re Estate of Brown,* 29 Wn.2d 20, 185 P.2d 125 (1947); *In re Estate of Lyman, supra* at 952. Thus, E. A. contends that he could not be allowed to "breach" the contract between him and his spouse, Irene, by allowing the will to be probated.

■■ Each of the cases cited by plaintiff, emphasizing the contractual nature of the community property agreement, involved a surviving spouse who attempts to take

advantage of the agreement. In each case, the *deceased* spouse had taken actions subsequent to signing the community property agreement that would, if allowed, have been in derogation of the agreement's provisions. And, in each case, the surviving spouse raised a claim under the community property agreement *during the* probate proceedings. *See In re Estate of Wittman, supra* (decedent made will inconsistent with community property agreement); *In re Estate of Lyman, supra* (decedent made will inconsistent with community property agreement). That is not the case here. Nothing in the community property agreement required E. A. to retain the benefits of the agreement after his wife's death. He had the right to give up those benefits by giving effect to Irene's will through probate proceedings. His election to take under the will was within his power and was not prohibited by the provisions of the community property agreement. It was an election made after consultation with his attorney regarding the benefits to be derived thereby, which benefits he received and enjoyed. No principle of law prevents that election during the probate proceedings.

The plaintiff further contends, however, that he cannot be thought to have waived the agreement or elected to take under the will because the trial court found that he did not consciously intend for the administration of Irene's estate under the will to take place. Findings of fact Nos. 11, 15; conclusion of law No. 8. *See Weitzman v. Bergstrom,* 75 Wn.2d 693, 453 P.2d 860 (1969) (for waiver to be found there must be evidence of an intent to relinquish). But this argument ignores the fact that E. A. did act as personal representative and indeed caused the probate to proceed through his family attorney. These actions were inconsistent with any other intention but waiver. *See Haller v. Wallis,* 89 Wn.2d 539, 573 P.2d 1302 (1978) (authority of attorney to act for client). The acts of becoming personal representative and accepting benefits of the will constitute an election of its provisions under the law of this state.

*Collins v. Collins,* 152 Wash. 499, 278 P. 186 (1929) (surviving spouse precluded from claiming community property interest in realty by acting as deceased spouse's executrix and accepting benefits under his will); *In re Estate of Parkes,* 101 Wash. 659, 172 P. 908 (1918) (beneficiary claiming under will required to ratify every portion of the instrument). E. A. undeniably became personal representative and accepted benefits under Irene's will; there was no appeal of those proceedings in which the factual decision that E. A. had the intent to waive or elect could be examined, and we are now precluded by res judicata from doing so. As the Court of Appeals pointed out, "[i]n the absence of fraud, deceit or coercion, one cannot repudiate his own signature on an instrument whose contents he was *in law* bound to understand." *Norris v. Norris,* 25 Wn. App. 290, 297, 605 P.2d 1296 (1980).

The doctrine of res judicata prevents E. A. from now overturning the substantive probate proceedings in which the estate was administered under Irene's will. There was no evidence of extrinsic fraud, deceit, or coercion that would prevent reliance on the distribution undertaken in that probate proceeding. *Farley v. Davis,* 10 Wn.2d 62, 72, 116 P.2d 263, 155 A.L.R. 1302 (1941); *In re Estate of Ostlund, supra.* Even in light of the trial court's findings, E. A. as a matter of law elected to take under Irene's will by allowing it to be the basis for administration of his wife's estate. *In re Estate of Ostlund, supra.*

In light of our conclusions regarding these issues, we do not reach defendants' alternative claims that the community property agreement was executed as a result of a mutual mistake and that E. A. is now estopped from asserting rights under the community property agreement. We affirm the Court of Appeals' reversal of the trial court's decision quieting title in E. A. Norris. The Superior Court had jurisdiction over Irene Norris' estate in probate and E. A. Norris must be considered to have waived the benefits of the community property agreement and elected to

take under her will by acting as personal representative and directing the probate of her estate pursuant to the will.

UTTER, C.J., and ROSELLINI, DOLLIVER, HICKS, and WILLIAMS, JJ., concur.

STAFFORD, J., concurs in the result.

BRACHTENBACH, J. (dissenting)—The majority states two issues: (1) whether the probate proceedings had any effect at all in light of the existence of a community property agreement, and (2) if the probate proceeding was jurisdictionally justified, whether it had the effect of "cutting off" any rights under the community property agreement either because its effects cannot be challenged as res judicata or because the surviving spouse's actions constituted an election of the will by the surviving spouse.

Thus the majority acknowledges that res judicata or election are applicable only if the probate, in the words of the majority, was jurisdictionally justified.

Let us analyze the reasons which the majority seemingly relies upon to conclude that "the existence of a community property agreement does not necessarily prevent probate of the estate of the spouse dying first."

The majority maintains: "There is no general impediment to the probate of a decedent's estate that consists solely of community property subject to a community property agreement." That is the question, not the answer.

The majority asserts: "The community property agreement imposes no limitation on the disposition of the property by the surviving spouse after the death." That is irrelevant to resolution of the inquiry. The question being examined by the majority is whether the probate was jurisdictionally justified. Power of disposition after death scarcely bears on jurisdiction. If the point is of any consequence, it strongly suggests that the property has vested entirely in the surviving spouse.

Next the majority reasons that the right to probate the deceased spouse's estate is implied by the proviso of RCW

26.16.120. Significantly the majority does not quote the entire proviso. It reads:

*Provided, however,* That such agreement shall not derogate from the right of creditors, nor be construed to curtail the powers of the superior court to set aside or cancel such agreement for fraud or under some other recognized head of equity jurisdiction, *at the suit of either party.*

(Italics mine.) It is the italicized portion omitted by the majority. The court's right to set aside such agreement in a lawsuit is scant authority on the issue of conflict between a will and the agreement, particularly when the agreement is entirely unknown to the court. Certainly such potential remedy does not provide probate jurisdiction. It is legally without relevance and factually of no consequence under the facts.

Next the majority supports its conclusion by the assertion that

the possibility of administration is explicitly acknowledged in RCW 11.02.070:

The whole of the community property shall be subject to probate administration for all purposes of this title . . .

This reasoning is flawed for three reasons.

First, it is a necessary premise of that statute that it is applicable to probates over which the probate court has jurisdiction. To reason otherwise begs the question at issue.

Second, the statute merely codifies the decisional law that the entire community estate, if probated, is subject to community liabilities in the probate. *In re Estate of Schoenfeld,* 56 Wn.2d 197, 351 P.2d 935 (1960); *see Washington Probate Practice and Procedure,* Commentary at 10 (J. Steincipher ed. Supp. 1971). That commentary explains that this section was enacted for purposes of clarification and recites the prevailing rule that all of the community property is subject to probate for the purposes of collecting assets and discharging community debts and other obligations. It has nothing to do with initial jurisdiction.

Third, the majority's analysis ignores and nullifies the positive declaration of RCW 26.16.120 that nothing in Title 26 *or in any other law of this state* shall prevent the husband and wife from entering into a community property agreement concerning the disposition of the whole of the community property *to take effect upon the death of either.* More of this later.

The above leaves only one point by which the majority justifies its conclusion. The whole of the majority's rationale is:

> The cases cited by plaintiff to support this contention [presumably the contention that there is no property for the probate proceeding to operate upon because the community property agreement vests all title in the surviving spouse at death] involved *procedural* jurisdictional defects. In addition, the decedents in those cases had no claim to title in the property purportedly passed in their estates.

Two cases are cited, *Mezere v. Flory,* 26 Wn.2d 274, 173 P.2d 776 (1946) and *Parr v. Davison,* 146 Wash. 354, 262 P. 959 (1928). I agree with the majority that these cases do not control, but will discuss them later to show that they do not support the majority's result.

Before examining the facts, it is necessary to ascertain the nature, purpose and effect of a community property agreement. The statute provides that it takes effect upon the death of either husband or wife. RCW 26.16.120.

The cases clearly implement this statutory directive.

> [S]uch enforcible contracts are not wills and are not governed by the laws relating to wills. They are completely executed when one of the parties to the recorded contract dies. Title to the community property, thereupon, vests as the sole and separate property of the survivor.

*In re Estate of Wittman,* 58 Wn.2d 841, 843, 365 P.2d 17 (1961). *In re Estate of Brown,* 29 Wn.2d 20, 185 P.2d 125 (1947).

> Unless such a recorded contract is rescinded by the parties, it constitutes a conveyance by the decedent to a surviving spouse. The property covered by it cannot be

devised or bequeathed by will by either spouse while it remains in effect.

*In re Estate of Wittman, supra* at 843–44.

"As a dispositive instrument, the agreement takes effect at death . . . and prevails against the will of the decedent." Cross, *The Community Property Law in Washington,* 49 Wash. L. Rev. 730, 799 (1974).

The purpose of the agreement, when in statutory form, is to take advantage of the statute and vest title in fee simple in the survivor upon the death of either. *Bartlett v. Bartlett,* 183 Wash. 278, 282, 48 P.2d 560 (1935); *In re Estate of Brown, supra.*

One can and must conclude that the statute and cases unequivocally declare that the community property agreement prevails against an inconsistent will. Indeed, the author of the majority, writing for the Court of Appeals, has held that wills are necessarily subject to the obligations of a previously executed agreement and that a will could be probated only to the extent that the will was consistent with the community property agreement. *In re Estate of Lyman,* 7 Wn. App. 945, 952, 503 P.2d 1127 (1972). This court affirmed and adopted that decision in its entirety. *In re Estate of Lyman,* 82 Wn.2d 693, 512 P.2d 1093 (1973). In this case the wills were executed prior to the community property agreement; only that fact distinguished it from the *Lyman* case. But in fact a stronger case can be made for permitting the will to prevail if it is executed after the agreement. Yet a subsequent will has uniformly been turned away in favor of the community property agreement.

The extent to which the majority's holding frustrates the intent and purpose of the husband and wife in this case is established by the testimony of the surviving husband. Remember that these folks owned this property outright, accumulated over a lifetime. The husband had acquired his limited education, in a formal sense, during six "terms" of schooling. The farmlands were substantial in acreage, but

modest in producing income. The husband was asked why they signed the community property agreement. He replied:

> Well, the reason we changed the deal there is we thought it was a lot better for whoever passed away first that the property go to the other one. Then they could divide it whatever way they wanted to divide it.

He then acknowledged that he was aware that he already had a will. Asked if they signed it to save taxes, he stated:

> No, we didn't do it for tax purposes. That's very wrong. We did it because we thought it was a nicer way to divide the property, and the one that had the property then could divide it as they see fit to, and we thought that was nicer than it was to give it away the other way.

Again, the husband:

> Well, I think I explained that to you. The reason that we had this survivorship agreement in place of the will was that the one that was left had the say of the whole business. They could give it to whoever they wanted to. We thought it would be better than to give it the other way.

Can there be any doubt that the parties knew exactly what they were doing? Can there be any doubt that they knew of their prior wills and intended to change the results of those wills? Can there be any doubt that the scheme of disposition via survivorship far outweighed any tax savings which would accrue only upon the second death? Finally, can there be any doubt that the majority's result frustrates their clear intent?

Admittedly the agreement was a valid contract at the time of the wife's death. What was the effect at that point? From the exact and positive language of the statute, and our adhering interpretations, the agreement then took effect and "[t]itle to the community property, thereupon, vests as the sole and separate property of the survivor." *In re Estate of Wittman, supra* at 843; RCW 26.16.120. Those assets subject to the agreement did not constitute assets over which the probate court had jurisdiction.

> It is manifest from a reading of our probate act that property of some kind and value belonging to the estate

of the deceased person is essential to the appointment of an administrator of his estate. . . .

. . .

. . . Such also is the weight of authority generally.

*In re Estate of Dickerson,* 51 Nev. 69, 74–76, 268 P. 769, 770 (1928).

The existence of property belonging to the decedent is another important prerequisite to the probate court's jurisdiction to administer his estate. This jurisdictional fact must be shown, for if the decedent left no property, there is no estate that can be administered.

24 Cal. Jur. 3d *Decedents' Estates* § 119, p. 227. *See In re Estate of Patrick,* 195 Wash. 105, 79 P.2d 969 (1938).

We can draw an authoritative analogy to the survivorship characteristic of joint tenancy. It is uniformly held that such incident passes the property by operation of law and is not part of the decedent's estate. *In re Estate & Guardianship of Wood,* 193 Cal. App. 2d 260, 14 Cal. Rptr. 147 (1969) ("is not subject to administration in the decedent's estate"); *In re Estate of Roehlke,* 231 N.W.2d 26 (Iowa 1975); *In re Smith,* 361 Mass. 733, 737, 282 N.E.2d 412, 415 (1972) ("does not constitute a part of the decedent's estate"); *McPherson v. Minier,* 179 Neb. 212, 137 N.W.2d 719 (1965).

The dilemma in this case stems from the husband's actions in probating the inconsistent will of his deceased wife. The finding of the trial court that the husband never appeared in court and that the community property agreement was never revealed to the probate court is not challenged. The court also made the following *unchallenged* finding:

Neither Mr. Norris nor his son, Henry, had a full understanding at this time of the implication of the Community Property Agreement, the life estate will and taxes involved in the first estate (Irene's) and that there would be tax savings with the will only on the second estate (E. A. Norris')."

While error is assigned to the finding that "Plaintiff [husband] and Irene Norris signed the Community Property Agreement with knowledge of what they were doing," the testimony quoted earlier obviously constituted substantial evidence to support this finding. No error is assigned to the finding that the husband did not have a full understanding (of the probate matter) and left a great deal up to his attorney.

The court found:

> The plaintiff [surviving husband] had no realization of the consequences of the probate and plaintiff thought he owned all interest in the property, pursuant to the Community Property Agreement.

Error is assigned.

The attorney explained to the surviving husband that if they used the community property agreement, it would be necessary to make lifetime gifts to reduce the size of the estate passing upon the husband's death. *In fact* such gifts were made.

The attorney testified that the husband decided to "go on the will," but the husband testified as follows:

Q. Do you recall making a decision on the will or the community property agreement?
A. Well, I think that I told [the attorney] that's the way we want it and that—
Q. Which way, sir?
A. The community property, have it settled on the community property and then the one that was left could take care of it however they liked to. . . .

Further, the husband testified:

Q. Now, can you explain to me how it came about that [the attorney] probated Irene's will?
A. Well, I don't know. You know, I kind of left it up to Ed [the attorney]. I thought he'd do the right thing for me and, you know, I probably didn't watch that thing as close as if it would have been a stranger. So that's how the thing kind of worked out, but I didn't think I was signing away the right to my land or anything like that. . . .

Q. Did you talk about taxes at all, that you can recall?

A. Well, the only thing, as I remember, Eddie [the attorney] said that if we made it out on the will, it would save a lot of taxes, but I didn't know that I was doing away with the right of survivorship when I was letting him do it. . . .

The attorney never gave a written explanation of the reason for the probate. Indeed, he took the position that the community property agreement was void from its inception.

In the face of this substantial evidence that the surviving husband obviously did not understand the effect of probate and that he consistently intended to claim his contractual right of survivorship, the majority holds, despite a directly contradicting finding of fact, that the husband was bound, as a matter of law, by the actions of his attorney and the probate court. He was never present in that court. It is apparent that the husband thought the whole proceeding was only to save taxes; that he never intended to disclaim his right of survivorship under the agreement.

If in fact the survivor has this right of disclaimer, the majority fails to explain why it was necessary for the legislature, 3 years after this probate was started, to enact a specific right of disclaimer. RCW 11.86.020.

The majority cites *Mezere v. Flory,* 26 Wn.2d 274, 173 P.2d 776 (1946) and *Parr v. Davison,* 146 Wash. 354, 262 P. 959 (1928). Those cases merely prove that when the decedent had no title to the realty, it could not be created by a decree of the probate court. That destroys reliance upon *In re Estate of Ostlund,* 57 Wash. 359, 106 P. 1116 (1910).

No matter what label is affixed to the analysis of the majority, it still spells waiver.

It should be remembered that waiver is an equitable doctrine. Its purpose is to facilitate the doing of equity . . . it is still necessary to show that the party who it is claimed has waived a right, *did so intentionally and with full knowledge of his rights.* In *Vienneau v. Goede,* 50 Wn.2d 39, 309 P.2d 376 (1957), we held that *the question* whether there was an intent to waive *is one of fact.*

(Italics mine.) *Weitzman v. Bergstrom,* 75 Wn.2d 693, 699, 453 P.2d 860 (1969). The existence of the intent to waive must be made *clearly* to appear. *O'Connor v. Tesdale,* 34 Wn.2d 259, 263, 209 P.2d 274 (1949).

The testimony quoted as well as that referred to falls far short of an intentional relinquishment of a known right shown by clear evidence. The majority is content to ascribe to this relatively uneducated man these high standards of intent and knowledge as a matter of law. I am not so willing in order to thwart the lucid explanations of the actual intent of the parties when dealing with their own property; neither was the trial court, and it made such a finding. I would not ignore it.

I dissent.

Reconsideration denied February 26, 1981.