[No. 62-40855-2.   Division Two.   April 16, 1970.]

THE STATE OF WASHINGTON, *on the Relation of John J. O'Connell, as Attorney General, Appellant,* v. PUBLIC UTILITY DISTRICT NO. 1 OF KLICKITAT COUNTY *et al., Respondents.*

*Houghton, Cluck, Coughlin & Riley* and *Paul Coughlin*, for respondents.

*Slade Gorton, Attorney General* and *Robert F. Hauth, Assistant,* for appellant.

*Schumacher & Charette* and *Robert L. Charette,* for intervenor.

**REVIEW GRANTED BY SUPREME COURT**

PETRIE, J.—Since December, 1962, the defendant, Public Utility District No. 1 of Klickitat County (PUD), has engaged in a limited "Installment Sales Program," which plaintiff, State of Washington acting through the office of the attorney general, (State) contends is both in excess of its express or implied powers and also violative of article 8, section 7 of the Washington State Constitution.

Acting pursuant to provisions of RCW 43.09.260, the then attorney general instituted these proceedings against PUD, its commissioners and general manager, in Klickitat County Superior Court in October, 1967, seeking a declaratory judgment declaring the rights, powers and duties of the parties and declaring specified activities of PUD to be ultra vires. In addition, the State sought injunctive relief prohibiting continuation of the installment sales program. PUD denied committing any ultra vires or unconstitutional acts and asked dismissal of the complaint. By agreement of the parties, Washington Public Utility Districts' Associa-

tion, Inc., was allowed to intervene as a party interested in the issues involved.

State's motion for summary judgment was denied, trial to the court resulted in entry of findings of fact, conclusions of law and judgment in favor of PUD. State has appealed, assigning error to (1) denial of its motion for summary judgment, (2) admission of portions of testimony of PUD's witnesses, and admission of several exhibits offered by PUD, (3) entry of several findings of fact, and (4) entry of judgment for PUD and denial of injunctive relief.

The "Installment Sales Program" is best described in findings of fact 2, 5 and 6 as follows:

2

Beginning in December, 1962 and continuing to the present time, the District has carried on an Installment Sales Program under which it takes assignments of sellers' interests in conditional sales contracts from dealers or electrical contractors who have sold the electrical equipment covered by the contracts to customers of the District under which it acquires the seller's interest in the contract and in the chattel covered thereby. It pays to the dealers an amount equal to the balance after down-payment owing by the vendee under the contracts. . . .

5

The purchase of the vendors' interests in the conditional sales contracts and of the chattels covered thereby by the District is confined to contracts entered into by its own customers who purchase all their electricity from the District. Except for one small town, the District is the sole supplier of electric service in Klickitat County. *The customers learn about the program almost entirely through the electrical contractors and electrical equipment sellers.* The program has been limited largely to contracts in connection with electrical equipment of comparatively large value and of special types, particularly equipment for electric heating, air conditioning, irrigation pumping, commercial cooking and refrigeration. From December, 1962 until the end of 1967 there were 44 transactions involved, with the amount per transaction averaging $2,240.

## 6

The contracts usually cover the installation as well as the sale of the electrical equipment. An Application for Approval of Conditional Sales Contract is filled out by the customer, who provides credit references which are investigated by the District. The District also investigates the credit of the vendor unless it already is familiar with it. The District requires a good credit rating for the customer and the dealer. The applications are considered by the manager and by the commissioners of the District. Some have been rejected because the electrical equipment covered by the contract would not have added appreciably to the District's electric load. The District requires an interest rate of 5%. The District requires that the amount of the down payment paid to the dealer or contractor be 10% or more. *If not rejected, the proposed transaction is given tentative approval by the commissioners of the District prior to its actual consummation between the vendor and vendee; but no legally enforceable commitment is then made by the District.* After the transaction has become specific and the customer and the contractor or dealer have fixed its exact total amount and the exact amount of the down payment, and these matters have been committed to written form on a conditional sales contract form furnished by the District, the transaction is returned to the District and the contract is offered for final acceptance by the District for purchase at the amount of the balance owing on it. Except in a few instances of contracts relating to cost of labor of installation only, the assignments made have been with recourse against the dealer or contractor. For many months it has been the practice of the District to take assignments only with recourse and it has no intention of taking assignments hereafter which are without recourse. *No final commitment on a contract is made by the District until such time as the particular contract has been entered into by the seller and the purchaser.* The assignments carry title to the property covered by the contracts as well as to the contracts themselves.

(Italics ours — state has assigned error to the italicized portions only.)

■ We need pause only briefly to consider—and dispose of—the majority of State's assignments of error. First,

no formal order denying the motion for summary judgment was entered by the court. However, a clerk's minute entry dated June 26, 1968 declares "Motion of Plaintiff for Summary Judgment was DENIED /s/ Blaine Hopp, Judge." Further, it appears that the motion for summary judgment was based, in part, upon "answers to interrogatories on file with the court in this case." No such answers to interrogatories have been certified to us either by way of transcript or otherwise. Obviously therefore, we have no way of evaluating fully the trial court's denial of this motion. *Kataisto v. Low*, 73 Wn.2d 341, 438 P.2d 623 (1968); *Sinclair v. Betlach*, 1 Wn. App. 1033, 467 P.2d 344 (1970).

In any event, the trial court's denial of the motion for summary judgment could well have been based upon the obvious conflict in a material issue of fact before the court. Some of the documents relied upon by State are subject to the inference that PUD gave full and final approval to the conditional sales contracts prior to their execution by the dealers and PUD's customers. On the other hand, the affidavit of PUD's General Manager, Emmet E. Clouse, opposing motion for summary judgment, indicates that no final approval is made until after the instruments have been fully executed and the dealer seeks assignment of the seller's interest therein to PUD. We conclude that the trial court properly denied the motion for summary judgment.

Next, we turn to those assignments of error challenging the relevancy and materiality of portions of PUD's testimonial and documentary evidence. The State takes the position that any evidence running to the economic reasons why PUD engages in this installment sales program is not material to either the statutory or the constitutional issue presented in this case; and presumably—since relevancy is also challenged—the specific evidence does not logically tend to prove any material fact in issue. The PUD, on the other hand, contends that a material fact it is entitled to establish, at least as to the statutory issue, is whether or not purchase of this type of property is necessary or convenient to its statutory purpose. We agree with the latter

contention. Furthermore, after review of the challenged evidence it is clearly apparent that each item challenged logically tends to establish that the program either benefits the system's load factor or assists PUD to meet competition for sale of energy. The trial court properly admitted this evidence for the purpose of resolving the statutory issue posed by the pleadings.

The State also challenges all or portions of nine separate findings of fact entered by the court. As to seven of such findings, the challenge is that they "have no relevancy to the constitutional question" or that "motives of financial benefit to respondent PUD in initiating and conducting its program are irrelevant to the issue of its constitutionality." By its complaint, State challenged not only the constitutionality of the program, but also the statutory authority of PUD to engage in such a program. The issues were properly tried together. We find the challenged findings not only relevant but also amply substantiated by the record.

The State also assigns error to so much of finding of fact No. 5 as reads:

> The customers learn about the program almost entirely through the electrical contractors and electrical equipment sellers.

Portions of testimony by PUD's general manager ran as follows:

> Q Mr. Clouse, how do your customers, ordinarily, find out about the program?
> A Generally from the dealers or maybe from other customers who have taken advantage of this program, but I think, generally, from the dealer.

We find, in the testimony of Mr. Clouse, sufficient support in the record to substantiate the challenged portion of this finding.

■ It is not our function to reevaluate the evidence. The finding must be accepted if there is substantial evidence to support it. *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn.2d 570, 343 P.2d 183 (1959). *James Mfg. Co. v. Stovner*, 1 Wn. App. 27, 459 P.2d 51 (1969).

The next assignment of error challenges portions of finding of fact No. 6 (italicized portions set forth above), which declare that (1) "no legally enforceable commitment" is made by PUD at the time tentative approval of a proposed contract is given, and (2) "no final commitment on a contract is made by the District until such time as the particular contract has been entered into by the seller and the purchaser." Here, State's argument is twofold: (1) that the challenged portion is in reality a conclusion of law and not truly a finding of fact; and (2) that the challenged portion is irrelevant in view of the overall substance of the transaction.

■ At best, the expression "no legally enforceable commitment" is certainly a mixed finding of fact and conclusion of law. As such, we are at liberty to find the trial court's interpretation thereof by reading the same in context with other findings of the court as well as the court's oral opinion. *Bennett Veneer Factors, Inc., v. Brewer,* 73 Wn.2d 849, 441 P.2d 128 (1968). *Northern Pac. Ry. v. State Util. & Transp. Comm'n,* 68 Wn.2d 915, 416 P.2d 337 (1966). Viewed in this light, it is readily apparent that the trial court simply declared that the PUD made "no commitment" or made "no final commitment", or in some fashion reserved the right to refuse to accept any given proposed assignment until after the transaction between the dealer and customer had been consummated. This we find substantiated by the record. The State has presented no alternative proposed finding. In any event, the words "legally enforceable" within a finding of fact are surplusage only. We will not disturb the finding, but will merely interpret the same in accordance with the trial court's clearly manifested intention. The relevancy of this finding will become apparent as we discuss the constitutional issue presented by this appeal.

■ Having thus disposed of the pretrial motion and settled upon the established facts of the case, we are now prepared to explore the two major issues. The State rightly contends that the constitutional issue should be considered.

first. Obviously, if the facts demonstrate that PUD engaged in an unconstitutional program, there would be no need to examine the question of statutory authority. The constitutional provision is mandatory if the facts fall within its ambit. *Washington Natural Gas Co. v. PUD No. 1,* 77 Wn.2d 94, 459 P.2d 633 (1969).

Specifically, State contends that PUD's Installment Sales Program constitutes a lending of credit or a lending of money by a municipal corporation violative of Const. art. 8, § 7, which provides:

> No county, city, town or other municipal corporation shall hereafter give any money, or property, or loan its money, or credit to or in aid of any individual, association, company or corporation, except for the necessary support of the poor and infirm, or become directly or indirectly the owner of any stock in or bonds of any association, company or corporation.

It should be noted that the State, at least on appeal, does not contend that PUD's program constitutes a gift. Hence, the prior decisions of the Supreme Court deciding what is and what is not an unconstitutional *gift* have no decisive effect except to the extent that such opinions may provide insight as to the court's interpretation of an unconstitutional lending of credit or lending of money. *See State ex rel. O'Connell v. Port of Seattle,* 65 Wn.2d 801, 399 P.2d 623 (1965); *Johns v. Wadsworth,* 80 Wash. 352, 141 P. 892 (1914).

We consider, first, whether the facts, as determined by the trial court and as now constituting the established resolution of disputed facts, support State's contention that PUD engaged in an unconstitutional lending of credit. In order to provide a meaningful answer to this question, we must first ascertain what the phrase "loan of credit" means in its constitutional sense.

■ Both parties to this action remind us of, and we accept, the basic rule of constitutional interpretation:

> Constitutions being the result of the popular will, the words used therein are to be understood ordinarily in the sense that such words convey to the popular mind. The

meaning to be given to the language used in such instruments is that meaning which a man of ordinary prudence and average intelligence and information would give. Generally speaking, the meaning given to words by the learned and technical is not to be given to words appearing in a constitution.

*State ex rel. State Capitol Comm'n v. Lister,* 91 Wash. 9, 14, 156 P. 858 (1916).

It seems apparent that article 8, section 7 of the constitution contemplates (except for necessary support of the poor and infirm) imposition of four separate and distinct limitations upon a municipal corporation's authority to aid private parties: (1) gift of money; (2) gift of property; (3) loan of money; and (4) loan of credit. Furthermore, it is reasonable to assume that those limitations are also distinct from the limitation on a municipality's authority to incur indebtedness imposed by the preceding section of the same article. (Const. art. 8, § 6.) The niceties of distinction among the various prohibitions are not often clearly enunciated— nor are such distinctions often necessary. To further complicate the entire picture, the constitutional limitation on credit applied to the state government includes not only a "loan of credit", but also a "gift of credit." (Const. art. 8, § 5.) Again, the niceties of distinction are not always observed.

■ However, we are not left entirely without judicially pronounced guidelines. In *Gruen v. State Tax Comm'n,* 35 Wn.2d 1, 211 P.2d 651 (1949), the court[1] quoted from and cited approvingly *Grout v. Kendall,* 195 Iowa 467, 472, 192 N.W. 529 (1923). In *Grout,* the Iowa court interpreted a similarly worded provision of its state constitution. The court asked the question, "What is meant herein by a loan of *credit?*"

After discussing the historical reasons surrounding the inclusion of such limitation within state constitutions, the court answered its own query by declaring at page 473:

---

[1]The vigorous minority opinion in *Gruen* expressed "no serious differences" with this portion of the majority opinion.

It withheld from the constituted authorities of the state *all power or function of suretyship.* It forbade the incurring of obligations by the indirect method of secondary liability. This is the field and the full scope of this section. It does not purport to deal with the creation of a primary indebtedness for any purpose whatever.

In *Washington Natural Gas Co. v. PUD No. 1, supra,* our Supreme Court sustained the practice of a PUD which permitted a land developer, under given circumstances consistent with the statutory purpose of the PUD, to earn a $150 credit on an installation contract within a 3-year period. The court determined that the practice of granting this type of credit did not contravene the provisions of article 8, section 7, either as an unconstitutional gift or as a loan of money or credit. Commenting specifically on that aspect of the challenged practice bearing on a "loan of credit", the court declared at page 100:

> The municipality, we think, may, consistent with efficient management, sell and deliver electrical energy to its citizens and customers on short term credit as long as this procedure does not allow the customer to convert this concession into a profitable hypothecation of credit with third persons.

A "profitable hypothecation of credit" connotes to us the concept of a risk-taking use of another's good name. If a concession can be converted into a profitable hypothecation of credit, it would seem to follow that an unprofitable hypothecation of that credit might also result from the concession granted. It is precisely the delusional unlikelihood of the unprofitable hypothecation of credit that the framers of our constitution sought to avoid by permanently removing from governmental administrators the temptation to lend the good name of the municipality, and its consequent ability to borrow, to private parties.

With these criteria as guidelines, can we say that PUD engaged in an unconstitutional lending of its credit? PUD's simple response to this charge is that it does not in any sense loan *its* credit to anyone; the credit involved is that of the installment plan purchaser to whom the sale is made

by the dealer, and possibly the credit of the dealer who guarantees PUD (by assigning the contract with recourse) that the customer-purchaser will pay the balance due. The State insists, however, that the dealer, in executing these contracts, does so in reliance on the previously expressed willingness and ability, and the prior unreserved commitment, of PUD to accept the assignment. Such a position runs directly contrary to the established fact in this case that PUD reserves the right at all times not to accept the assignment. We cannot, as State urges us to, accept as a fact that PUD's commitment to accept the assignment dates from the time of its "tentative approval." We think the answer to this contention is best summarized by remarks of the learned trial judge at the conclusion of the trial:

> The possibility, and I feel it is only a possibility, is raised here by argument that after all certain commitments are made, Mr. Clouse deals with these people, he tells them, "If you borrow this much over this length of time and put this installation in, we will take the contract," but there is no instance brought to the court's attention where he ever did this without reservation, that this is not subject to final approval.
>
> Now, I can understand how some businesses could to this. Occasionally it would be such that, perhaps, Mr. Clouse or the principal would be subject to some principle of the promissory estoppel or something of that nature. I can see where this could happen, but I don't see where it has happened. No evidence it ever did happen and until it does the court cannot condemn the practice. The court feels insofar as the claim of lending credit is concerned the plaintiff has failed in its proof.

So long as it is not established that any individual sale is made by a dealer in reliance upon the credit of PUD, we cannot hold that PUD has loaned its credit to a private, non-governmental body.

Does the program, as set forth under the established facts of the case, embrace an unconstitutional loan of public money?

Both finding of fact No. 2 and those portions of finding of fact No. 5 to which State has assigned no error,

declare unequivocally that PUD purchases vendors' interests in conditional sales contracts. State does not in any fashion challenge the form or the substance of the documents which PUD purchases. Therefore, the existence of a "loan of money" must stand or fall upon the relationship created by the execution of a conditional sales contract followed by subsequent assignment of the seller's interest therein.

In *Oliver v. Electrical Prods. Consol.,* 59 Wn.2d 276, 278, 367 P.2d 618 (1961), the Supreme Court redeclared the office of a conditional sales contract:

> The conditional sale contract is a device recognized by statute to protect the seller of personal property which is to be paid for in installments although possession is delivered to the conditional vendee. [Citations omitted.] However, it may not be used as security for a loan, for that is the office of a chattel mortgage.

In *Lyon v. Nourse,* 104 Wash. 309, 312, 176 P. 359 (1918), the declaration is even more significant:

> It is not the office of a conditional bill of sale to secure money loaned. Its purpose is only to permit the owner of personal property to make a *bona fide* sale on credit, reserving the title in himself until the purchase price is fully paid in the manner and under the conditions laid down in the statute.

Similarly, a purchase or assignment of the seller's interest in a conditional sales contract does not constitute a loan. *General Elec. Credit Corp. v. Oregon State Tax Comm'n,* 231 Ore. 570, 373 P.2d 974 (1962); *Dunn v. Midland Loan Fin. Corp.,* 206 Minn. 550, 289 N.W. 411 (1939).

The state relies upon the recent decision of *Weitzman v. Bergstrom,* 75 Wn.2d 693, 453 P.2d 860 (1969), for the proposition that "refinancing" a conditional sales contract per se creates a loan. We do not so view that as the holding in *Weitzman.* Although the initial contract in *Weitzman* was termed a conditional sales contract, its status as such is suspect because of a clause providing for deficiency judgment. *Oliver v. Electrical Prods. Consol., supra.* In any event, there is no indication in the facts of this case that

PUD ever engaged in any refinancing of its contracts. In *Weitzman,* the subsequent transaction obviously resulted in execution of a note and mortgage. The court, noting this, declared at page 716:

These are evidences of a debt, and it is reasonable to assume that the appellant exacted these instruments in order to make himself more secure in seeking his deficiency judgment in event of further default on the part of the respondent.

Of course, every use of money which results in a purchase of property cannot sidestep the constitutional proscription.

In *Aberdeen v. National Sur. Co.,* 151 Wash. 55, 275 P. 62, 65 A.L.R. 794 (1929), the court determined that a municipality's purchase of an interest-bearing 6-month time certificate of deposit, which by its terms was not subject to check, constituted a loan of the municipality's money in contravention to the constitution. At page 60, the court declared:

Not only did the relation of debtor and creditor exist by the very terms of the instrument evidencing that fact, but the debt was not due and payable until a future fixed date, and was clearly a transaction prohibited by our constitutional provisions above quoted.

Clearly, under the facts of this case, the relationship of debtor and creditor did not exist as to any contract. We hold, therefore, that PUD, through its Installment Sales Program, did not loan any public money in contravention of article 8, section 7 of the Washington State Constitution.

We turn finally to the question of whether or not PUD has statutory authority to engage in this specific Installment Sales Program. We find ample authority in the act creating Public Utility Districts (Laws of 1931, ch. 1) as subsequently amended by the legislature, to support the purchase of the vendor's interest in these conditional sales contracts. Under the facts, sales are limited to those which clearly assist PUD to improve its system load factor, certainly a necessary element to insure its continued existence

and reasonably incidental to the conduct of its utility business.

The State argues vigorously that PUD's purchase of existing conditional sales contracts cannot have any effect upon sale of electricity; the buyer had already purchased the equipment or appliance and would continue to use it regardless of who subsequently purchased the executory contract. In its brief, State declares:

Presumably the same buyer would have purchased the same item from the same seller; unless the district's anticipated participation had a *prior* influence on the sale. The prior influence must have been the assurance that respondent PUD would ultimately assume the financial burden and the seller's risk. In short, the sale would not have been effected unless the purchaser (and, more importantly, the seller) were assured that the PUD would take the seller out of the transaction.

For that reason, respondents' theory is self-defeating. If respondent PUD's asserted power can be implied at all, it can only be implied upon an argument which makes it unconstitutional. It is in essence an admission that respondent PUD, to stimulate sales, unconstitutionally lends its credit or funds to or in aid of private individuals or enterprises.

The weakness of this ingenious argument is that PUD's "prior influence" is not the assurance that it *would* ultimately assume the financial risk, but rather that the program itself stimulates sales resulting in executory contracts, some of which *may* ultimately be purchased by PUD.

The judgment is affirmed.

ARMSTRONG, C. J., and PEARSON, J., concur.

---

Petition for rehearing denied May 22, 1970.