

# Office of the Attorney General
## State of Texas

**DAN MORALES**
ATTORNEY GENERAL

April 4, 1996

The Honorable Tim Curry
Criminal District Attorney
Tarrant County
401 West Belknap
Fort Worth, Texas 76196-0201

Opinion No. DM-382

Re: Whether a district clerk may require an advance deposit of fees for service of process by a sheriff or constable; whether deferred collection of the fee for service of civil process by a sheriff or constable constitutes a loan of credit under article III, section 52, or article XI, section 3, of the Texas Constitution (RQ-757)

Dear Mr. Curry:

You have asked us whether a district clerk may require an advance deposit of fees for service of process by a sheriff or constable in a civil case. You note that Texas Rule of Civil Procedure 17 provides that the serving officer generally may not demand payment of the fee for service of process in a civil case, "but his fee shall be taxed and collected as other costs." You also note that Texas Rule of Civil Procedure 126 provides an exception to rule 17 when process is issued in a case pending in a county other than the county in which the sheriff or constable is to serve process. In that situation, the service fee must be paid in advance or a pauper oath must be on file in the case. Tex. R. Civ. P. 126. We do not consider that exceptional situation in this opinion.

Taxation of costs is "[t]he process of ascertaining and charging up the amount of costs and fees in an action to which a party is legally entitled, or which are legally chargeable." BLACK'S LAW DICTIONARY 1460 (6th ed. 1990). Rule 17 therefore requires that the service fee be ascertained and charged as a cost of court, not collected in advance. *See Rodeheaver v. Alridge*, 601 S.W.2d 51, 54 (Tex. Civ. App.--Houston [1st Dist.] 1980, writ ref'd n.r.e.) ("there is no statutory authorization for the constable to require an advance deposit of fees for service of citation").

In addition, rule 17 requires that the fee be "collected as other costs." Texas Rule of Civil Procedure 149 provides for collection of costs by execution as follows:

> When costs have been adjudged against a party and are not paid, the clerk or justice of the court in which the suit was determined may issue execution, accompanied by an itemized bill of costs, against such party to be levied and collected as in other cases; and said officer, on demand of any party to whom any such costs are due,

shall issue execution for costs at once. This rule shall not apply to executors, administrators or guardians in cases where costs are adjudged against the estate of a deceased person or of a ward. No execution shall issue in any case for costs until after judgment rendered therefor by the court.

*See also* Tex. R. Civ. P. 129 (establishing failure to pay costs within ten days of demand as condition precedent to authority to issue certified bill of costs), 130 (authorizing sheriff or constable to levy upon property of debtor party "upon demand and failure to pay said bill of costs").

Texas Rule of Civil Procedure 143 does, however, authorize the court to enter a prejudgment order, either sua sponte or upon a motion by a party or an interested officer of the court, ruling that a party seeking affirmative relief must give security for costs accruing in the suit. Furthermore, Texas Rule of Civil Procedure 146 permits the party who has been ruled for costs to elect to deposit money instead of posting a cost bond. The court may not set an amount for the deposit in lieu of bond that is greater than the costs that have accrued in the case. *See. e.g., Hager v. Apollo Paper Corp.,* 856 S.W.2d 512, 515 (Tex. App.--Houston [1st Dist.] 1993, no writ).

The rules of civil procedure thus expressly prohibit compulsory prejudgment collection of the service fee, *see* Tex. R. Civ. P. 17, 149, although the court may order that a person seeking affirmative relief give security for the fee, *see id.* Rule 143. We accordingly conclude that a district clerk has no authority to require an advance deposit of fees for service of process in a case pending in the county in which the sheriff or constable is to serve process.

You also ask, contingent on this conclusion, whether the rules of civil procedure violate article III, section 52, and article XI, section 3, of the Texas Constitution by requiring counties to extend credit to private parties. Section 52(a) of article III provides:

> Except as otherwise provided by this section, the Legislature shall have no power to authorize any county, city, town or other political corporation or subdivision of the State to lend its credit or to grant public money or thing of value in aid of, or to any individual, association or corporation whatsoever, or to become a stockholder in such corporation, association or company.

Section 3 of article XI provides in part as follows: "No county, city, or other municipal corporation shall hereafter become a subscriber to the capital of any private corporation or association, make any appropriation or donation to the same, or in anywise loan its credit . . . ."

You suggest that taxation of the fee for service of process pursuant to rule 17 and delayed collection of the fee pursuant to rule 149 may violate the constitutional prohibitions against the lending of credit for the reason that these procedures amount to

the extension of credit to the party requesting service. While we agree that taxation and delayed compulsory collection of the fee for service of process amount to an extension of credit, we disagree with your assumption that a county necessarily "lend[s]" or "loan[s] its credit" whenever it extends credit to a vendee. It is our opinion that the Texas courts would hold that the mere fact that a county has sold goods or services for deferred payment does not mean that the county has "loan[ed] its credit" within the meaning of article XI, section 3, and that the authorization of such a practice by the Texas Supreme Court pursuant to legislative authority does not mean that the legislature has authorized a "county ... to lend its credit ... in aid of, or to any individual, association or corporation" within the meaning of article III, section 52. In short, we believe that a sale of goods or services for deferred payment is not a "loan of credit" as that phrase and similar phrases are intended in the constitution. We conclude that taxation and delayed compulsory collection of the fee for service of process is a mere extension of credit and so does not implicate the constitutional prohibitions against lending credit.

To explain our reasons for reaching this conclusion, it is appropriate first to consider other constitutional provisions that are complementary to section 52 of article III and section 3 of article XI. One provision, section 50 of article III, in the following language prohibits the State itself from lending its credit:

> The Legislature shall have no power to give or to lend, or to authorize the giving or lending, of the credit of the State in aid of, or to any person, association or corporation, whether municipal or other, or to pledge the credit of the State in any manner whatsoever, for the payment of the liabilities, present or prospective, of any individual, association of individuals, municipal or other corporation whatsoever.

In a 1960 report to the legislature, the Texas Legislative Council explained that this section has substantially the same historical background as article III, section 49, which prohibits, with a few exceptions, the creation of State debt,[1] and that this section

---

[1] Section 49(a) provides:

No debt shall be created by or on behalf of the State, except:

(1) to supply casual deficiencies of revenue, not exceed in the aggregate at any one time two hundred thousand dollars;

(2) to repel invasion, suppress insurrection, or defend the State in war,

(3) as otherwise authorized by this constitution; or

(4) as authorized by Subsections (b) through (f) of this section.

The framers borrowed section 49 verbatim from the Pennsylvania Constitution, except for the amount of the debt limitation (which was one million dollars in the Pennsylvania Constitution). Tex. Const. art. III, § 49 interpretive commentary.

"prohibits the State doing indirectly what Section 49 prohibits it doing directly, i.e. becoming indebted as a guarantor or surety for another's debt." 2 TEXAS LEGISLATIVE COUNCIL, CONSTITUTIONAL REVISION: A STUDY OF THE TEXAS CONSTITUTION WITH RECOMMENDED CHANGES 260. Also, section 51 of article III generally forbids the legislature or any governmental agency authorized by the legislature "to grant or authorize the making of any grant of public moneys to any individual, association of individuals, municipal or other corporations whatsoever." The Texas Legislative Council stated in its 1960 report that section 51 was intended to supplement the

> general prohibition against expenditure of public money for other than public purposes as expressed in Section 3 of Article 8 and the first sentence of Section 6 of Article 16. And, in a somewhat more general way, this section complements the prohibitions expressed in Section 3 of Article 11 prohibiting donations to the capital of any private corporation or association.

*Id.* at 263-64 (footnotes omitted[2]).

There is no controlling precedent on the question of what exactly is a "loan of credit" under the constitution, but there is one Texas decision that appears to be premised on the assumption that an extension of credit is a loan of credit. The decision of the court of civil appeals in *McCarty v. James*, 453 S.W.2d 220 (Tex. Civ. App.--Austin 1970, writ ref'd n.r.e.), appears to assume that a sale of cigarette tax stamps to a distributor for payment due fifteen days after receipt of the stamps would constitute a lending of the State's credit under article III, section 50, if the distributor were liable for the tax. The court avoided the constitutional problem, however, by interpreting the cigarette tax statute at issue as creating a tax obligation that arose only at the time of the first retail sale of the cigarettes and as imposing the tax only upon the first purchaser rather than upon the distributor, who had only a duty to make an "advance payment" of the tax. *Id.* at 224, 226. Insofar as the cigarettes might be sold before the fifteen-day deadline for payment by the distributor, the court approved of the distributor's payment after the time of the first sale on the ground that the statute provided for an adequate bond to cover the amount of such deferred payment. *Id.* at 224. Finally, the court recognized a rule of administrative necessity as justifying a reasonable time for a taxpayer to pay taxes: "Regardless of when tax liability arises or when taxes become due and payable a reasonable time usually and probably of necessity, is given the taxpayer for making payment. The Legislature is the sole arbiter of the time to be allowed." *Id.* If an extension of credit by the State is a loan of the State's credit, the court did not acknowledge the apparent conflict between this rule of administrative necessity and the constitutional prohibition.

---

[2]The omitted footnotes quote section 3 of article VIII ("Taxes shall be levied and collected by general laws and for public purposes only") and part of section 6 of article XVI ("No appropriation for private or individual purposes shall be made . . .").

*McCarty* does not establish a precedent that a mere extension of credit by the State is a loan of the State's credit. The *McCarty* court was not asked and did not consider this issue. "A decision is not authority upon a question not raised and considered in the case, although it may be involved in the facts." *United States v. Miller*, 208 U.S. 32 (1908). "[S]tare decisis [is] limited to questions raised and decided on full consideration." *American Transfer & Storage Co. v. Brown*, 584 S.W.2d 284, 298 (Tex. Civ. App.-- Dallas, 1979), *rev'd on other grounds*, 601 S.W.2d 931 (Tex. 1980), *cert. denied*, 449 U.S. 1015 (1980). We therefore are not bound by an unstated assumption in that case.

Furthermore, having researched our prior opinions, we have found none that analyze the question of whether a credit sale of goods or services by the State or a political subdivision constitutes a loan of the credit of the State or its political subdivision. As the court did in *McCarty*, this office in prior opinions has assumed that such an extension of credit is a loan of the government's credit, but none of the opinions indicate that this office actually considered whether the assumption was correct. *See* Attorney General Opinions JM-1229 (1990), JM-749 (1987), JM-533 (1986), MW-461 (1982), No. 2996 (1937). We therefore must consider your question as one of first impression.

To ascertain the meaning of the constitutional prohibitions against giving, lending, or pledging credit, it is appropriate to consider "the history of the times" in which they were adopted, "the evils intended to be remedied, and the good to be accomplished." *Travelers' Ins. Co. v. Marshall*, 76 S.W.2d 1007, 1012 (Tex. 1934). In a nineteenth century case, *City of Cleburne v. Gulf, C. & S.F. Ry.*, 1 S.W. 342 (1886), the Texas Supreme Court explained the historical background of section 3 of article XI as follows:

> Section 3 of article 11 of the constitution prohibits municipal corporations from making appropriations or donations or loans of its credit to private corporations. The object of this provision was to deprive municipalities of the power possessed by them under the constitution of 1869, in the exercise of which many counties and towns in the state assumed burdens not yet discharged, in anticipation of benefits never realized. The increase in population and values expected from railway connection in many instances never came; and the tax, not lightened from these sources, depressed values, prevented immigration, and became a curse to the localities which had invited it as a blessing. In localities in which the delusion had not been dissipated by experience, the people were still stimulated by false hopes and fraudulent assurances to make extravagant donations to coveted railroads. While the power lasted, corporate greed found local pride and ambition an open way to municipal revenues. The scheme was generally consummated by a contract, by which the railway company bound itself to construct its line through a county, or in a given distance of a town, in consideration of so many thousand dollars of negotiable bonds of the county or town. This section deprived municipalities of the power to

> make such contracts. Its terms are broad enough to prohibit a city or town, in its corporate capacity, from appropriating its revenues, or using its credit, to obtain right of way and depot grounds for a railway company . . . .

*Id.* at 342.

Railroad investment failures like those just described were occurring in much of the burgeoning nation during the middle nineteenth century. Other states responded with constitutional limitations similar to the Texas provisions cited above. According to one author,

> [t]he first state constitutions and the Constitution of the United States imposed no limits on the extent to which the governments they created might incur debt. Until 1840 no state constitution had imposed any limit on the authority of a state to borrow. Between 1840 and 1855, however, in reaction to the financial mismanagement of early nineteenth century state legislatures, the constitutions of nineteen states were amended to include such restrictions. The practice spread until at the present time the constitutions of all but five states of the Union limit in some way the authority of the Legislature to incur public debt. . . .
>
> . . . [Such constitutional restrictions] represent popular reaction to more than one period of "boom and bust" in American history during which state governments borrowed heavily to invest in internal improvements, financial institutions, railroads, canals and so on during the boom, only to face great difficulty in meeting their obligations during ensuing "panics." . . .

BYRON R. ABERNETHY, CONSTITUTIONAL LIMITATIONS ON THE LEGISLATURE 54-55 (University of Kansas Publications, Governmental Research Series No. 20, 1959), *reprinted in* 2 TEXAS LEGISLATIVE COUNCIL, *supra*, at 237-38.

Another author explained as follows the various constitutional restrictions that were added to state constitutions in reaction to the public investment failures of the last century:

> Debt limitations, provisions requiring electorate approval of borrowing, prohibitions against the state's becoming a party to any work of internal improvement, and prohibitions on financial aid to private enterprise were the principal constitutional limitations which emerged. . . . Three principal types [of prohibitions on financial aid to private enterprise] predominate. First, and most common, is the clause--referred to herein as the credit clause--which provides that the credit of the state and of its political subdivisions "shall not in any

manner be given or loaned to or in aid of any individual, association or corporation." A second type, almost as fashionable as the first, is a clause--referred to herein as the stock clause--which prohibits the state and political subdivisions from becoming stockholders in any corporation. These two provisions were a direct response to two common methods of providing public financial assistance to railroads. One method was public guaranty of railroad bonds, which in some instances took the form of an exchange of railroad bonds for governmental obligations, the latter then being sold on the market by the private corporation. In reality, the railroad was the principal debtor and the more attractive public credit was made available only to assist it in raising the necessary capital. As a variant of this procedure, there were instances of the donation of county and municipal bonds to railroad corporations. The credit clause was designed to eliminate these forms of financial aid to private enterprise. However, in the case of the political subdivisions, the other method--stock subscriptions--was by far the most common form of financial assistance. Typically railroad stock was exchanged for public bonds, the latter, of course, being duly sold by the corporation on the market. Even though the public stock subscriptions were almost universally financed by borrowing, the legislatures and courts of the time drew a clear distinction between an exchange of bonds for bonds, prohibited by the credit clause, and an exchange of public bonds for railroad stock, which was viewed as a form of joint venture in the business of railroading not prohibited by the credit clause. This distinction made necessary the stock clause as an additional constitutional safeguard against public financial assistance to the railroads.

The credit and stock clauses, however, did not erect any barrier against loans or donations financed out of current taxation, or against gifts of land. A number of states, therefore, adopted additional prohibitions barring this type of aid, even though it did not occur in significant proportions. This third type of clause, somewhat less common than the credit and stock clauses, varies in wording from jurisdiction to jurisdiction. Pennsylvania's is typical in commanding the legislature not to authorize any political subdivision "to obtain or appropriate money for . . . any corporation, association . . . or individual."

David E. Pinsky, *State Constitutional Limitations on Public Industrial Financing: An Historical and Economic Approach*, 111 U. PA. L. REV. 265, 278-79 (1963) (footnotes

omitted).[3]  The author also noted that the phrase "lending of credit" was very "popular in the nineteenth century but now [is] relatively obsolete." *Id.* at 280.  Although the author described two examples, public guaranties of railroad bonds and donations of public bonds to railroad corporations, as being barred by the credit clause, *id.* at 278-79, he stated no definition of what activity constitutes "lending of credit."

The meaning of the phrase "lending of credit" and similar phrases has been a subject of a good number of reported decisions in various states.  Texas, unfortunately, is not one of those states.

The courts of some states have narrowly construed "loan of credit" or a similar phrase as including only an assumption of secondary liability.[4]  A thorough treatment of the narrow construction is found in the 1923 case of *Grout v. Kendall*, 192 N.W. 529 (Iowa).  In *Grout* the Supreme Court of Iowa held that the State of Iowa would not violate a constitutional prohibition against giving or lending the state's credit by issuing bonds for the purpose of paying a bonus to veterans of World War I.  *Id.* at 533.  The court reasoned that the lending of credit that was prohibited by the constitution was only the creation of a surety obligation:

> What is meant by a loan of "credit"?  When one signs an accommodation note and delivers it to his neighbor, he loans his credit to his neighbor.  He has not created a debt to him.  The neighbor is authorized to use the credit with third parties; but he is also under obligation to the maker to protect him against liability and ultimately to return the note.  When one becomes surety for his neighbor and signs his promissory notes to third parties, he loans his credit.  As to the holder of the note, he has promised to pay it; but as between him and the principal maker, it is still the debt of the principal and not that of the surety.  The liability of the surety is always secondary and not primary.  It is a liability for the debt of another, which such other is bound to pay.

*Id.* at 531.  The Iowa court found that secondary liability, unlike primary liability, seduces the surety into the complacent belief that the surety will not have to pay the obligation, a

---

[3]Note that both article III, section 52, and article XI, section 3, include a credit clause, a stock clause, and an appropriation clause.

[4]Decisions concluding that "loan of credit" or a similar phrase means only an assumption of secondary liability include the following:  *Common Cause v. Maine*, 455 A.2d 1, 28-29 (Me. 1983); *Tosto v. Pennsylvania Nursing Home Loan Agency*, 331 A.2d 198, 205 (Pa. 1975); *Johns Hopkins University v. Williams*, 86 A.2d 892, 901-02 (Md. 1952); *Gruen v. Tax Commission*, 211 P.2d 651, 668-69 (Wash. 1949) (en banc); *Wisconsin ex rel. Wisconsin Development Authority v. Dammann*, 280 N.W. 698, 715 (Wis. 1938).  *See also Bush v. Martineau*, 295 S.W. 9, 11 (Ark. 1927) (statute providing for issuance of state bonds for construction of state roads was not unconsititutional, for it did not propose that state should lend credit "but only use its credit").

belief that history has proved to be frequently unwarranted. *Id.* The court concluded that the credit clause was intended to prohibit only the "delusion of suretyship" and therefore does not prohibit the undertaking of primary obligations:

> The ultimate cry of the surety is: I would not have become surety if I had known or believed that I should have to pay the debt. This is as true of states as of individuals. It was to remove this delusion of suretyship with its snare of temptation that this section of the Constitution was adopted. It withheld from the constituted authorities of the state *all power or function of suretyship.* It forbade the incurring of obligations by the indirect method of secondary liability. This is the field and the full scope of this section. It does not purport to deal with the creation of a primary indebtedness for any purpose whatever. That question was left to be dealt with in other sections. . . .
>
> We hold therefore, that the prohibition of section 1, art. 7, has no reference to the creation of a primary indebtedness.

*Id.*

Applying this understanding of the credit clause to the proposed state bond issue under the veterans bonus act, the court found no merit to the argument that the bond issue would be an unconstitutional loan of credit:

> It is urged that when the state borrows money upon its bonds for the purpose of paying the same to the beneficiaries of the act, it loans its credit to such beneficiary, because without the credit of the state the beneficiary could not obtain the money at all. The argument is not sound. The beneficiary is not a debtor all. He sustains no relation of liability to the bondholder either primary or secondary. The state recognizes the beneficiary as in the nature of a creditor to whom the state proposes to pay its recognized obligation. The state becomes debtor to the bondholder under a primary liability and not a secondary one. Neither legislator nor voter is beguiled by any delusion that the bonds will be paid by some one else as a primary debtor.

*Id.* at 533.

A broader construction of the credit clause--that "lending of credit" also occurs when the government incurs primary indebtedness--is found in several other cases.[5] For

---

[5]Decisions concluding that "loan of credit" or a similar phrase includes an assumption of primary liability as well as an assumption of secondary liability include the following: *Veterans' Welfare Board v. Jordan,* 208 P. 284 (Cal. 1922); *New York v. Westchester County National Bank,* 132 N.E. 241, 245 (N.Y. 1921) (issuance of state bonds and gift of proceeds to railroad corporation would be unconstitutional gift

example, in *Jarrolt v. City of Moberly*, 103 U.S. 580 (1880), the Supreme Court construed a credit clause as prohibiting a municipal corporation in Missouri from issuing public bonds and using the proceeds for the purchase of a machine shop to give to a railroad. *Id.* at 585. In spite of the fact that the municipal corporation would obligate itself primarily, not secondarily, on the bonds and thus would not fall within the letter of the prohibition against lending credit, the Court held that the prohibition should be construed "so as to give it effective operation and suppress the mischief at which it was aimed." *Id.* at 586. The Court explained:

> Both modes of using the bonds of the municipality are equally a use of its credit, the difference being that the one is a direct and the other an indirect way of employing the credit of the municipality for the benefit of the railway company. It would be a narrow and strict construction of the constitutional provision to hold that it prohibited the creation of indebtedness by a municipality by a direct use of its credit for the railway company, and yet permitted such creation by the indirect use of it for the same purpose.

*Id.* at 585-86.

In spite of this lack of consensus on the meaning of a "loan of credit," all of the foregoing authorities implicitly agree that a lending of credit requires the assumption of some kind of financial liability by the government. Other cases are explicit on this point.[6]

For example, the Supreme Court of Idaho stated in *Engelking v. Investment Board*, 458 P.2d 213 (1969), that the word "credit" in the Idaho Constitution's prohibition against the giving or loaning of the state's credit "implies the imposition of some new financial liability upon the State which in effect results in the creation of State

---

(footnote continued)
of state's credit); *William Deering & Co. v. Peterson*, 77 N.W. 568, 569-70 (Minn. 1898) (because of credit clause, state "cannot borrow money on its own bonds and then loan the money"); *Garland v. Board of Revenue*, 6 So. 402, 403 (Ala. 1889) (credit clause prohibits "any aid, by issuing bonds or otherwise, by which a pecuniary liability is incurred, furnished by the municipalities named to private enterprises").

[6]Decisions concluding that a lending of credit requires the assumption of some kind of financial liability by the government include the following: *Wilmington Medical Center v. Bradford*, 382 A.2d 1338, 1348-49 (Del. 1978) (there is no pledge of state credit without incurring of public legal liability guaranteed by state taxing power); *Foster v. North Carolina Medical Care Commission*, 195 S.E.2d 517, 525 (N.C. 1973); *Allen v. Tooele County*, 445 P.2d 994, 995 (Utah 1968) (county would not "lend its credit" to another unless county might in some eventuality become indebted); *Uhls v. Wyoming ex rel. City of Cheyenne*, 429 P.2d 74, 86 (Wyo. 1967) (city did not violate constitution by lending or giving its credit where no debt against city was contracted). *See also Industrial Dev. Auth. v. Eastern Kentucky Regional Planning Comm'n*, 332 S.W.2d 274, 278 (Ky. 1960) (loan of state funds is not loan of state credit; state becomes debtor when it loans its credit); *Fairbank v. Stratton*, 152 N.E.2d 569, 573 (Ill. 1958) (same); *Almond v. Day*, 91 S.E.2d 660, 667 (Va. 1956) (credit clause construed as applying to transactions in which state incurs indebtedness). *Contra Ohio v. Brand*, 197 N.E.2d 328, 333 (Ohio 1964).

debt for the benefit of private enterprises." *Id.* at 218. Thus, the court held, the investment of existing funds of the state in bonds, notes, and stock of private corporations did not violate the credit clause, "for no new State debts are created by such action." *Id.*

Another case applying the rule that a lending of credit requires the assumption of some kind of financial liability by the government is the Florida Supreme Court decision of *Nohrr v. Brevard County Educational Facilities Authority*, 247 So. 2d 304, 309 (1971). There the court upheld, against a credit-clause challenge, a state law "authoriz[ing] a board of county commissioners to establish a county educational facilities authority to issue revenue bonds for financing the construction of facilities for private higher educational institutions in the county," *id.* at 307. Having noted the statutory provision stating that the bonds "shall not be deemed to constitute a debt or liability of the state or of any such county, but Shall be payable solely from the funds herein provided therefor from revenues," *id.* at 307-08, the court applied the same rule as did the Idaho court in *Engelking*:

> The word 'credit,' as used in [the credit clause of Florida's constitution], implies the imposition of some new financial liability upon the State or a political subdivision which in effect results in the creation of a State or political subdivision debt for the benefit of private enterprises.
>
> In order to have a gift, loan or use of public credit, the public must be either directly or contingently liable to pay something to somebody. Neither the full faith and credit nor the taxing power of the State of Florida or of any political subdivision thereof is pledged to the payment of the principal of, or the interest on, these revenue bonds. The purchasers of the revenue bonds may not look to any legal or moral obligation on the part of the state, county, or authority to pay any portion of the bonds.

*Id.* at 309.

We have found no precedent for the construction of a credit clause as meaning that a state or a political subdivision lends its credit when it merely extends credit to another.[7]

---

[7]We did, however, find one case that discusses the possibility that a sale on credit in certain circumstances might constitute a prohibited loan of credit. That case, *Washington ex rel. O'Connell v. Public Utility District No. 1*, 469 P.2d 922 (Wash. App. 1970), *rev'd on other grounds*, 484 P.2d 393 (Wash. 1971), discussed the following passage from *Washington Natural Gas Co. v. Public Utility District No. 1*, 459 P.2d 633 (Wash. 1969) (en banc): "The municipality, we think, may, consistent with efficient management, sell and deliver electrical energy to its citizens and customers on short term credit as long as this procedure does not allow the customer to convert this concession into a profitable hypothecation of credit with third persons." *Id.* at 639, *quoted in Washington ex rel. O'Connell*, 469 P.2d at 927. The court explained its understanding that "[a] 'profitable hypothecation of credit' connotes to us the concept of a risk-taking use of another's good name. If a concession can be converted into a profitable hypothecation of credit, it would seem to follow that an unprofitable hypothecation of that credit might also result from the concession granted." 469 P.2d at 927-28. You do not suggest any circumstances that

Because the great weight of authority from other states uniformly construes similar credit clauses as referring to the assumption of some kind of financial liability by the government, we believe the Texas courts would do likewise and would hold that a loan or gift of credit does not occur when the State or a political subdivision merely becomes a creditor by selling goods or services for deferred payment. The situation about which you inquire, taxation of the fee for service of process pursuant to Texas Rule of Civil Procedure 17 and delayed collection of the fee pursuant to Texas Rule of Civil Procedure 149, does not involve a county's assumption of any liability but rather involves only the county's sale of a service to another for deferred payment. In such a transaction the county becomes a creditor, not a debtor. We therefore conclude that taxation of the fee for service of process pursuant to rule 17 and delayed collection of the fee pursuant to rule 149 do not constitute a loan of a county's credit in violation of article XI, section 3, nor does authorization of such a practice by the Texas Supreme Court pursuant to legislative authority mean that the legislature has authorized a "county . . . to lend its credit . . . in aid of, or to any individual, association or corporation" in violation of article III, section 52.

As we noted above, in the past this office has assumed that a mere extension of credit by deferred collection of fees is a "giving or lending[] of the credit of the State" for purposes of constitution article III, section 50; a "lend[ing of] its credit" by a county for purposes of article III, section 52; or a "loan [of] its credit" by a county for purposes of article XI, section 3. This assumption dates back at least to 1937, when, in Attorney General Opinion No. 2996, this office opined that the sale of certain tax stamps for payment by a draft payable at a future date "would amount to the State doing a credit business" in violation of the credit clause of article III, section 50, and that a sale of the stamps on consignment also "would be lending the credit of the State." Attorney General Opinion No. 2996, 1936-1938 Tex. Att'y Gen. Biennial Rep. 43. The opinion cites no authority for this proposition.

In Attorney General Opinion MW-461, this office concluded that section 50 prohibits a state agency from deferring until the end of each month the collection of charges for copies of public records. With no discussion of what actually constitutes the lending of credit of the State's credit,[8] the attorney general concluded, "To defer the payments of charges for copies of public records by means of a monthly billing of the

---

(footnote continued)
would indicate that anyone is engaging in risk-taking behavior based on deferred payment for service of process.

[8]The opinion quotes a statement in an informal letter opinion numbered R-2358 (1951), in which, according to the opinion, an assistant attorney general opined that "'our laws contemplate, it seems, that State offices or enterprises, the management of which requires the collection of public funds or charges, should be operated on a cash basis.'" Attorney General Opinion MW-461 (1982) at 2. The opinion does not specify whether the mention of "our laws" quoted from the informal letter opinion is a reference to any of the credit clauses in the constitution. We have been unable to locate a copy of the informal letter opinion.

accumulated charges is just such an extension of the state's credit which is constitutionally proscribed." Attorney General Opinion MW-461 (1982) at 3.

In Attorney General Opinion JM-533, this office was asked whether a county clerk may maintain credit accounts for fees due. The attorney general noted that the phrases "lend its credit," as found in article III, section 52; "loan its credit," as found in article XI, section 3; and "lending of the credit," as found in article III, section 50, "appear to have the same meaning." Attorney General Opinion JM-533 (1986) at 3. The attorney general then quoted the following passage from page 225 of George D. Braden's *The Constitution of the State of Texas: An Annotated and Comparative Analysis* (1977):

> Section 50 states that the legislature may not "give" the credit of the state to anybody, "lend" the credit of the state to anybody, or "pledge" the credit of the state for anybody. . . . This is an involved and somewhat imprecise way of saying that the state may not aid anybody by lending him money; by providing him land, goods, or services on credit; or by guaranteeing payment to a third party who aids anybody by lending him money or providing him land, goods, or services on credit.

*Id.* at 2 (emphasis added). This office also cited an 1889 Texas Supreme Court case, *City of Cleburne v. Brown*, 11 S.W. 404, as holding that a city would "loan its credit" in violation of article XI, section 3, by accepting a proposed corporation's bonds in payment for its transfer of its waterworks to the corporation. The attorney general concluded:

> In the light of the City of Cleburne holding, we believe the proscriptions of article III, section 52, and article XI, section 3, mean that county officers are not authorized -- and cannot be authorized -- to deliver county services to individuals, associations or corporations on credit unless some other provision of the constitution authorizes it [sic] to do so.

Attorney General Opinion JM-533 (1986) at 3. We note that the emphasized language quoted above from *The Constitution of the State of Texas* cites no authority and that we find no other case citing *City of Cleburne* as authority for the rule stated as the holding of that case in Attorney General Opinion JM-533.[9]

---

[9]The opinion in *City of Cleburne*, we believe, involved more than a mere extension of credit. The controlling fact the court noted in concluding that the transfer of the city's waterworks to a proposed corporation "would have amounted to nothing more than a loan by the city of Cleburne of its credit to the proposed corporation" was that "[t]he agreement entered into does not define the powers, nor state the amount of capital, of the proposed corporation." *City of Cleburne*, 11 S.W. at 405. Thus, the proposed corporation might have been undercapitalized and consequently might have defaulted in payment of its operating costs, leaving the city with the burden of paying off the corporation's creditors.

In Attorney General Opinion JM-749, this office was asked whether a county's acceptance of credit cards as payment of fees constitutes an unconstitutional "lending of credit." Attorney General Opinion JM-749 (1987) at 2. In that opinion the attorney general noted with approval the conclusion of Attorney General Opinion JM-533 (erroneously cited as Attorney General Opinion JM-522 (1986)) "that article III, section 52, clearly prohibits the legislature from authorizing county officers to deliver county services on credit." *Id.* at 2. The attorney general concluded that "[n]o 'lending of credit' by the county occurs" when payment is made by credit card, for a third-party lender--not the county--acts as a creditor in such a transaction and the county merely stands in the position of a merchant. *Id.*

Finally, in Attorney General Opinion JM-1229, a consolidation of two opinion requests, the attorney general was asked whether a county may sell gas and fuel products on a thirty-day account with monthly billing for accumulated charges and whether the State Law Library must receive payment before sending requested photocopied materials by next-day delivery or facsimile transmission, as opposed to enclosing a bill for charges along with the copies. Attorney General Opinion JM-1229 (1990) at 2. The attorney general assumed the correctness of the statement in Attorney General Opinion MW-461 that "'[t]o defer the payments of charges for copies of public records by means of a monthly billing of the accumulated charges is just such an extension of the state's credit which is constitutionally proscribed.'" Attorney General Opinion JM-1229 (1990) at 2 (quoting Attorney General Opinion MW-461 (1982) at 2). The attorney general then concluded that a loan of credit does not violate article III, section 52, or article XI, section 3, if it "accomplishes a public purpose and is accompanied by controls that ensure the use of public credit for a public purpose." *Id.* at 8.

In light of our conclusion above that a mere extension of credit by deferred collection of fees in a sale of goods or services does not violate the credit clauses of the constitution, we disapprove of any statement or implication to the contrary in Attorney General Opinions No. 2996, MW-461, JM-533, JM-749, and JM-1229, and any other prior opinions of this office. We caution that an extension of credit, in some factual contexts, may constitute a loan of credit or may implicate other constitutional or statutory prohibitions.

## S U M M A R Y

A district clerk is not authorized to require an advance deposit of fees for service of citation in a case pending in the county in which the sheriff or constable is to serve process. The requirements in the rules of civil procedure that fees for service of process by a sheriff or constable be taxed as costs and that such costs be collected by execution only after judgment do not constitute a lending of credit or a grant of a thing of value in violation of the Texas Constitution. We disapprove of Attorney General Opinions No. 2996, MW-461, JM-533, JM-749, and JM-1229, and any other prior opinions of this office insofar as they state or imply that a mere credit sale of goods or services by the State or one of its political subdivisions violates the credit clauses of the constitution.

Yours very truly,

DAN MORALES
Attorney General of Texas

JORGE VEGA
First Assistant Attorney General

SARAH J. SHIRLEY
Chair, Opinion Committee

Prepared by James B. Pinson
Assistant Attorney General